## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SAAD BIN KHALID**, | **Case No.** |
| *Plaintiff,* | **Hon.** |
| v. | |
| **MERRICK GARLAND**, Attorney General of the United States, U.S. Department of Justice, in his official capacity, only; | |
| **CHRISTOPHER WRAY**, Director, Federal Bureau of Investigation, in his official capacity, only; | |
| **CHARLES H. KABLE, IV**, in his official capacity as Director of the Terrorist Screening Center; | |
| **ALEJANDRO MAYORKAS**, Secretary, U.S. Department of Homeland Security, in his official capacity, only; | |
| **DAVID PEKOSKE**, Administrator, Transportation Security Administration, in his official capacity, only; and, | |
| **TROY MILLER**, Commissioner, U.S. Customs and Border Protection, in his official capacity, only; | |
| *Defendants.* | |

## <u>COMPLAINT</u>

Plaintiff Saad Bin Khalid, by and through his attorneys, CAIR Legal Defense Fund,

brings this action against Merrick Garland; Christopher Wray; Charles H. Kable, IV;

Alejandro Mayorkas; and David Pekoske, for declaratory and injunctive relief, costs, and attorneys' fees for violations of the Fifth Amendment of the United States Constitution, violations of the Administrative Procedure Act, 5 U.S.C. §§ 702, 706, and violations of the Religious Freedom Restoration Act, 42. U.S.C. § 2000bb *et seq.,* committed when Defendants placed Plaintiff on the government's No Fly List that indefinitely bars Plaintiff from flying to, from, within, or over the United States. The government has wrongly stigmatized Plaintiff as a terrorism suspect. Plaintiff's improper placement on the Defendants' list has caused economic, reputational, and liberty harms. Plaintiff remains stranded abroad, due to his inability to travel, and cannot return to his home country, the United States.

## INTRODUCTION

1.      For nearly two decades, the U.S. government has operated a No Fly List that indefinitely bars thousands of U.S. citizens and residents from flying to, from, within, or over the United States, and wrongly stigmatizes them as terrorism suspects. The government places people on the No Fly List based merely on a "reasonable suspicion" that unconstitutionally vague criteria are satisfied. U.S. citizens and residents on the No Fly List are disproportionately Muslim, and those of Arab, Middle Eastern, or South Asian descent.

2.      Plaintiff Saad Bin Khalid is a twenty-seven-year-old United States Citizen of Pakistani descent who lives in Karachi, Pakistan with his wife and daughter.

3.      Mr. Khalid was a minor when he was initially flagged by the U.S. government. In 2012, at 16 or 17 years old, Mr. Khalid travelled from Karachi, Pakistan back to the United States. At Jinnah International Airport, his boarding pass was stamped with "SSSS" indicating that he had been designated as a "known or suspected terrorist." His belongings were searched by security during his first leg of his trip, including at his layover at Dubai

2

International Airport. At JFK, CBP officers searched through his cell phone and FBI agents interrogated him about his time in Pakistan, his parents, and his devotion to his faith.

4.      After Mr. Khalid returned to his home in Cleveland, Ohio, FBI agents contacted him and set up an interrogation during which they interrogated him about whether he knew individuals who wanted to cause harm to the U.S and whether he was affiliated with any individuals or organizations who wanted to cause harm to the U.S.

5.      Mr. Khalid learned he had been added to the No Fly List in 2019 when he tried to return to the U.S. from Karachi, Pakistan. DHS prohibited Mr. Khalid from boarding his flight and directed him to contact his local U.S. consulate, where FBI agents interrogated him while at the consulate. Mr. Khalid was told to file a DHS TRIP complaint and no information was given to him regarding Mr. Khalid's placement on the No Fly List. Mr. Khalid remains stranded abroad and has been unable to return to the United States, for nearly two years, due to his placement on the No Fly List.

6.      Because the government has placed Mr. Khalid on the No Fly List, he is banned from returning to his home country, the United States. Mr. Khalid is unable to travel to see friends and family, particularly those in the United States. If permitted to return to the United States, and unless he is removed from the No Fly List, Mr. Khalid will not be able to travel to fulfill his religious pilgrimage obligation, which is a tenet of his Muslim faith. Due to his watchlist placement, Mr. Khalid has faced financial strains as a result of his placement on the No Fly List.  He was forced to resign from his job and has lost several job opportunities due to his inability to return to the United States. As a result, Mr. Khalid has been unable to exercise his constitutionally protected liberty interests in travel and freedom from government-imposed stigma.

3

7.     Two years ago, Mr. Khalid filed a DHS TRIP application, the government's administrative petition for redress, and DHS confirmed that Mr. Khalid was on the No Fly List. On April 6, 2020, Plaintiff requested additional information pursuant to Defendants' process about his placement on the No Fly List. To date, Mr. Khalid has yet to receive additional information from Defendants regarding his placement. The government has failed to provide any reason or additional information regarding Mr. Khalid's placement on the No Fly List or a fair process to challenge that placement. Under the government's redress process, people seeking removal from the No Fly List may never receive notice of the reasons for their placement on the List, evidence supporting – or undermining – any such reason, or a live hearing before a neutral decision-maker.

8.     The government's actions violate Mr. Khalid's rights under the Constitution and federal law. Its placement of Mr. Khalid on the No Fly List and its refusal to provide a fair, meaningful, and timely process for him to challenge that placement violate the Fifth Amendment guarantee of due process and the Administrative Procedure Act. Its use of vague criteria to place Mr. Khalid on the No Fly List violates the Fifth Amendment. Its conduct in placement Mr. Khalid on the No Fly List after he rejected the FBI agents' repeated coercive pressure to acquiesce to interrogations constitutes retaliation in violation of the First Amendment. Through this action for declaratory and injunctive relief, Mr. Khalid asks the Court to find that the government's actions against him are unlawful and order his removal from the No Fly List.

## JURISDICTION AND VENUE

9.     Plaintiff's claims for injunctive and declaratory relief are brought under the First and Fifth Amendments of the United States Constitution, the Administrative Procedure Act ("APA"), and the Religious Freedom Restoration Act ("RFRA").

10.     This Court has original jurisdiction under 28 U.S.C. § 1331, 5 U.S.C. § 702, 5 U.S.C. § 706, the United States Constitution, and federal common law.

11.     This Court has personal jurisdiction over Defendants because a substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the District of Columbia.

12.     This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgement Act, 28 U.S.C. § 2201 and 2202.

13.     Under the APA, 5 U.S.C. § 706, this Court has the power to compel agency action that is unlawfully withheld or unreasonably delayed and to hold unlawful and set aside the challenged agency actions. The Due Process Clause also provides this Court with authority to order the injunctive relief requested against Defendants.

14.     This Court also has the authority to grant declaratory and injunctive relief under RFRA, 42 U.S.C. § 2000bb *et. seq.*

15.     Plaintiff's claims for attorneys' fees and costs are predicated upon 28 U.S.C. § 2412.

16.     Venue is proper under 42 U.S.C. § 1391(e)(1) because Defendants are officers or employees of agencies of the United States sued in their official capacities; because Defendants regularly conduct business in the District of Columbia; because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this district

including the dissemination of the federal terrorist watchlist and the stigmatizing label of "known or suspected terrorist" attached to the Plaintiff to the District of Columbia, local law enforcement officers, D.C. courts, and other governmental and private partners within the district; and because the action involved no real property.

## PARTIES

17.     Plaintiff Saad Bin Khalid is a twenty-seven-year-old U.S. Citizen. He was born in Yokohama, Japan, and resides in Karachi, Pakistan since 2012.

18.     Defendant Merrick Garland is the Attorney General of the United States and head the Department of Justice ("DOJ"), which oversees the FBI. The FBI administers the Terrorist Screening Center ("TSC"), which was created to consolidate the government's counterterrorism-related watch listing operations. The TSC is responsible for the management and operation of the Terrorist Screening Database ("TSDB"), also known as "the watch list."  The No Fly List is a component of the TSDB. Upon information and belief, the DOJ and/or its agency subcomponents accepted the nomination of Plaintiff. The DOJ and/or its agency subcomponents also oversee the dissemination of the "known or suspected terrorist" stigmatizing label attached to Plaintiff to state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others. Additionally, the DOJ utilizes the TSDB to screen persons against it that are applying for security clearances or employment to work with the DOJ and/or its agency subcomponents to deny them employment. Defendant Garland is sued in his official capacity, only.

19.     Defendant Christopher Wray is the Director of the FBI. Upon information and belief, the FBI and/or its agency subcomponents nominated Plaintiff Saad Bin Khalid

to Defendants' No Fly list. Additionally, the FBI utilizes the TSDB to screen persons against it that are applying for security clearances or for employment to work with the FBI and/or its agency subcomponents to deny them employment. Defendant Wray is sued in his official capacity, only.

20.     Defendant Charles H. Kable, IV is the Director of the Terrorism Screening Center ("TSC") of the Federal Bureau of Investigation ("FBI"). The TSC develops and maintains the federal government's consolidated Terrorism Screening Database ("TSDB"), accepted the nomination the Plaintiff to the No Fly List.  Defendant Kable, IV is being sued in his official capacity, only.

21.     Defendant Alejandro Mayorkas is the Secretary of the U.S. Department of Homeland Security ("DHS"), which oversees the Transportation Security Administration ("TSA"). Upon information and belief, DHS and/or its agency subcomponents act as front-line agencies that utilize the TSDB to screen individuals against the TSDB, including Plaintiff Saad Bin Khalid, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Additionally, DHS is responsible for overseeing and administering DHS TRIP, the only administrative complaint process by which Plaintiff may challenge his watchlist nomination to the TSDB and No Fly list. DHS also utilizes the TSDB to screen persons against it that are applying for security clearances or for employment to work with DHS and/or its agency subcomponents to deny them employment. Defendant Mayorkas is sued in his official capacity, only.

22.     Defendant David Pekoske is the Administrator of the Transportation Security Administration ("TSA") of the United States Department of Homeland Security ("DHS"). Upon information and belief, TSA acts as a front-line agency that utilizes the TSDB to screen individuals against the TSDB, including Plaintiff, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Moreover, TSA nominated Plaintiff to the TSDB and No Fly List. TSA implements the No Fly List through its Secure Flight program which prevents watch listed persons from boarding any aircraft. Additionally, TSA utilizes the TSDB to screen persons against it that are applying for security clearances or for employment to work with TSA to deny them employment. Defendant Pekoske is sued in his official capacity, only.

23.     Defendant Troy Miller is Commissioner of the United States Customs and Border Protection ("CBP") of the United States Department of Homeland Security ("DHS"). CBP acts as a front-line agency that utilizes the TSDB to screen individuals against the TSDB, including Plaintiff, in order to deny him government benefits and impose consequences upon him, including but not limited to: (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits. Moreover, upon information and belief, CBP nominated Plaintiff to the No Fly List. Additionally, CBP utilizes the TSDB to screen persons

against it that are applying for security clearances or for employment to work with CBP to deny them employment. Defendant Miller is being sued in his official capacity, only.

## FACTUAL ALLEGATIONS

### General Factual Allegations

24.     President George W. Bush executed Homeland Security Presidential Directive-6 on September 16, 2003. HSPD-6 directed the U.S. Attorney General to "establish an organization to consolidate the Government's approach to terrorism screening." HSPD-6 created the Terrorist Screening Center ("TSC"), which isadministered by the FBI.

25.     HSPD-6 also directs the Attorney General to consolidate terrorism- related information and then use it to support (a) federal, state, local, territorial, tribal, foreign-government, and private-sector screening processes, and (b) diplomatic, military, intelligence, law enforcement, immigration, visa, and protectiveprocesses. The TSC thus houses the Terrorist Screening Database ("TSDB" or "watchlist"). The TSDB is a centralized collection of information about listed individuals (i.e. "TSDB Listees"). The individual identifying information includes biographic and biometric data, such as names, aliases, birthdates, photographs, fingerprints, and iris scans.

26.     The TSDB is updated continuously and disseminated around the country and to more than 60 foreign governments around the world in real-time.

27.     Federal government agencies and foreign government partners draw the information supporting their nominations from intelligence, law enforcement, homeland security, embassy, consulate, financial, and immigration records.

28.    New additions to the TSDB must include minimal identifying and substantive information. The minimum identifying information must be sufficient to allow screeners to determine whether an individual's identity is an actual match to a TSDB record.

29.    The minimum substantive information must be enough to satisfy the TSDB inclusion standard, which the Government calls the "reasonable suspicion that the individual is a known or suspected terrorist" standard.

30.    The Government defines a "Known Terrorist" as "an individual who has been (1) arrested, charged by information, or indicted for, or convicted of, a crime related to terrorism and /or terrorist activities by the United States Government or foreign government authorities; or (2) identified as a terrorist or member of a terrorist organization pursuant to statute, Executive Order or international legal obligations pursuant to a United Nations Security Council Resolution."

31.    The Government defines a "Suspected Terrorist" as "an individual who is reasonably suspected to be engaging in, has engaged in, or intends to engage in conduct constituting, in preparation for, in aid of, or related to terrorism and /or terrorist activities."

32.    The Government adds individuals to the TSDB if their nomination is based "upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."

33.     The Terrorist Screening Center reviews all nominations to the TSDB and their supporting facts. The final authority to accept, reject, or modify a nomination rests with the TSC alone.

34.     The TSC may consider an individual's "race, ethnicity, or religious affiliation" as well as their "beliefs and activities protected by the First Amendment, such as freedom of speech, free exercise of religion, freedom of the press, freedom of peaceful assembly, and the freedom to petition the government for redress of grievances" as information supporting a nomination to the TSDB.

35.     The TSC may consider an individual's travel history, associates, business associations, international associations, financial transactions, and study of Arabic as information supporting a nomination to the TSDB.

36.     TSDB records are not criminal records. The TSC includes individuals in the TSDB who have not been convicted, arrested, investigated, or suspected of any crime. Inclusion in the TSDB does not require evidence that an individual has engaged in any criminal activity.  Inclusion in the TSDB does not require evidence that an individual has committed a crime, is committing a crime, or will commit a crime in the future. Individuals who have been acquitted of a terrorism-related crime may still be listed in the TSDB.

37.     Based on the specific needs and missions of its various partners, the TSC annotates TSDB records. TSC assigns these annotations based on distinct criteria from TSDB's overall inclusion standard. The final authority to accept, reject, or modify a nomination or annotation to a TSDB rests with the TSC alone. Defendant TSC is responsible for including, maintaining, and/or removing Plaintiff from the No Fly List and the TSDB.

38.     For the TSA, the TSC annotates TSDB entries in three ways: (1) No Fly, (2) Selectee, and (3) Expanded Selectee.

39.     The TSC assigns a No Fly annotation when the TSC determines the individual poses:

>   (a) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of piracy, or a threat to airline, passenger, or civil aviation security);
>
>   (b) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C.
>
>   (c) § 2331(5)) with respect to the homeland;
>
>   (d) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; or,
>
>   (e) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

40.     TSDB Listees with the No Fly List annotation are prohibited from boarding an aircraft that traverses U.S. airspace.

41.     TSDB Listees, whether bearing the No Fly List annotation are not, are also subjected to intensive scrutiny by the Government as a matter of TSDB encounter policy.

This includes the Government subjecting TSDB Listees to lengthy and onerous secondary screening at airports; subjecting TSDB Listees to lengthy and onerous secondary inspection at land borders; subjecting TSDB Listees to the mandatory search and copying of their electronic devices at borders; subjecting TSDB Listees to handling codes requiring  their arrest or other adverse treatment during any encounter with federal, state, local, or private law enforcement officers; barring TSDB Listees from access to employment or credentials across federal agencies and public and private infrastructure industries; and subjecting TSDB Listees' traveling companions, relatives, and other associates to comparable scrutiny.

42.    TSC does not notify individuals about their nominations or additions to the TSDB, or their nominations or additions to the No Fly List. There are no "adversarial hearings" regarding TSDB Listee status.

43.    The TSDB, since 2006, retains copies of all prior versions of listed persons' records.  TSDB Listees are not permitted to know the history of any changes to their watchlist status, or the factual basis for those changes.

44.    Following 2015 litigation in *Latif v. Holder*, the federal government modified the redress process for TSDB Listees who are U.S. persons and who have the No Fly List annotation. If a U.S. Person on the No Fly List files a DHS TRIP complaint, DHS TRIP (following referral to and consultation with TSC) must inform the individual if they are currently on the No Fly List. The No Fly Listee may then request additional information, including TSC's unclassified summary of the information supporting their No Fly List annotation. The No Fly Listee may respond by submitting information they consider potentially relevant or responsive to that unclassified factual summary.

13

45.     The redress policy which governs No Fly List annotations (as set forth below) does not apply to any other TSDB Listees, including those who remain on the TSDB although their No Fly List annotation has been removed.

46.     The TSC Redress Office has final authority to modify or remove a TSDB record during the redress process, including by adjusting or removing the No Fly List annotation.

47.     If the TSC chooses to maintain a person's No Fly List annotation, the TSC must prepare a recommendation to the TSA Administrator regarding the continuing No Fly List annotation on that TSDB Listee's record. The TSA Administrator them makes the final written determination concerning the maintenance or removal of the No Fly List annotation for U.S. Persons.  The TSC will then technically implement any change to the No Fly List annotation the TSA Administrator directs.

48.     The TSC removing an individual's No Fly List annotation does not mean that the  individual is also removed from the TSDB. The TSC alone remains responsible for a U.S. Person's overall TSDB Listee status.

49.     If the U.S. Person remains on the No Fly List following both TSC and TSA Administrator review, the TSA Administrator will issue a final order regarding the basis for that individual's continuing placement.  The final order will also notify the individual with the continuing No Fly List annotation of their ability to seek judicial review.

50.     Apart from the DHS TRIP Redress process, the TSC periodically reviews its TSDB listings and No Fly List annotations, based on new or additional information the TSC receives. Pursuant to that process, the TSC occasionally imposes or removes No Fly List annotations.

51.     Nothing prevents the TSC, after removing an individuals' No Fly List an-
notation, from re-adding the same individual to the No Fly List based on the same or similar
derogatory information.

52.     Plaintiff is justifiably skeptical of Defendants' willingness to engage in mean-
ingful introspection or self-correction. Famously, in *Ibrahim v. Department of Homeland Secu-
rity, et al.,* 06-CV-00545, ECF 701-1 (N.D. Cal. Feb. 6, 2014), Defendants vigorously con-
tested a Muslim graduate student's challenge to her No Fly List designation and subsequent
revocation of her student visa.  Defendants' actions stranded her in Malaysia for nine years.
Following trial, it was ultimately revealed that her placement on the No Fly List was the
result of an FBI agent's error in November 2004.  He had accidentally checked the wrong
box.  *Id.* at 9.

53.     Defendants have a pattern of using the TSDB and No Fly List as a
bludgeon to coerce everyday American Muslims into spying on their fellow religious
adherents and neighbors and becoming government informants. Presence on the
watchlist is deployed as an intimidation tactic and used to coercively justify the **denial
of** American-Muslims' civil rights, such as the right to have an attorney present during law
enforcement questioning. *See, e.g., Latif v. Holder*, 28 F. Supp. 3d 1134, 1145 (D. Or. 2014)
(an FBI agent told Steven Washburn that he "would help remove Washburn's name from
the No-Fly List if he agreed to speak to the FBI") ; *Id.* at 1146 (FBI agents told Ibrahim
Mashal that "his name would be removed from the No-FlyList and he would receive com-
pensation if he helped the FBI by serving as an informant"): *Id.* (FBI agents offered Amir
Meshal "the opportunity to serve as a government informant in exchange for assistance in

removing his name from the No-Fly List"); *Tanvir v Tanzin*, 894 F.3d 449 (2d Cir. 2018) (multiple Muslim Plaintiffs"asked to gather information on members of Muslim communities and report that information to the FBI" and "[i]n some instances, the FBI's request was accompanied with severe pressure, including threats of deportation or arrest; in others, the request was accompanied by promises of financial and other assistance").

54.    Agencies throughout the federal government utilize the federal terrorist watchlist to conduct and promote screening, subjecting listed persons to a comprehensive portfolio of consequences that cover large aspects of their lives.

55.    Government agencies routinely cross-reference the TSDB in connection with applications for or audits of a wide range of government benefits. The TSDB is referenced in connection with and used as a basis to deny federal government employment, security clearances (regardless of whether the individual needs that clearance for either government or private contractor employment), travel benefit programs like TSA PreCheck and Global Entry, and a wide variety of government licenses and credentials, used in both public and private employment, including FAA licenses, Hazmat licenses, Transportation Worker Identity Credentials, and security credentials needed for critical infrastructure projects like power plans.

56.    Defendants disseminated the federal terrorist watchlist to government authorities, private corporations and individuals with the purpose and hope that these entities and/or individuals will impose consequences on those individuals Defendants have listed, including Plaintiff.

57.    Upon information and belief, family-based immigration applications filed by individuals listed on the federal terrorist watchlist are delayed indefinitely due to an "FBI

name check" and not adjudicated, thereby denying and hindering Plaintiff of the rights that flow from citizenship, including the ability to sponsor lawful permanent residency for relatives living abroad.

58.     As detailed below, Plaintiff's watchlist status and his No Fly List annotation has been the subject of personal harm and contention with the United States government, for more than a decade.

### Specific Factual Allegations

59.     Plaintiff Saad Bin Khalid is a United States Citizen who has been living in Karachi, Pakistan since 2012 where he recently married his wife, Ms. Zaenab Afzal Mirajkar, and is raising their newborn daughter. Mr. Khalid's wife and daughter are not U.S. citizens, they are Pakistani citizens. Mr. Khalid has filed I-130 petitions and is awaiting processing by the National Visa Center.

60.     Mr. Khalid graduated in Fall 2016 from DHA Suffa University in Karachi, Pakistan with a bachelor's degree in business administration. Plaintiff also received a master's degree. Mr. Khalid currently is a partner and technical director for Global Services Marketplace (GSM). In this position, Mr. Khalid works on software development and provides resources necessary to develop technical solutions to developers. Plaintiff's employment is imperative to support his family.

61.     Since approximately 2012, because of Mr. Khalid's No Fly List designation, Mr. Khalid is prohibited from boarding a flight to the United States and remains stranded in Pakistan.

62.     When Mr. Khalid was only 16 or 17 years old, around 2012, he arrived at Jinnah International Airport (KHI) in Karachi, Pakistan for an international flight to John F. Kennedy International Airport (JFK) in New York.

63.     Mr. Khalid was unable to check-in for his flight online. Instead, he was directed to an airline agent for further assistance.

64.     The airline agent contacted Defendants to obtain clearance to print his boarding pass. Mr. Khalid's boarding pass had an "SSSS" stamp, indicating he had been designated as a "known or suspected terrorist."

65.     During his layover at Dubai International Airport (DXB), security personnel escorted Mr. Khalid into a private room where they thoroughly searched his belongings.

66.     Upon arrival at JFK, unidentified agents immediately escorted Mr. Khalid to CBP secondary inspection where CBP officers searched his personal belongings.

67.     Additionally, CBP officers confiscated his electronics and upon information and belief, downloaded information from them, including cell phone, without his consent.

68.     Two FBI agents then escorted Mr. Khalid into a private room where they interrogated him about his time in Pakistan and why he had returned to the U.S. after two years.

69.     FBI agents further interrogated Mr. Khalid about his parents, asking about their jobs and devotion to their religion. They interrogated him about how he prays, whether he attended madrasa in Pakistan, why he lived in Islamabad for one year, if he had a girlfriend, and what he had been doing in Pakistan. Finally, the FBI agents forced Mr. Khalid to draw his family tree and provide contact information for all those individuals.

18

70.     They finally allowed Mr. Khalid to leave for his connecting flight to Cleveland after approximately six or seven hours.

71.     Two days later, FBI agents contacted Mr. Khalid and requested he meet them in Washington, DC. Mr. Khalid was only a minor at the time.

72.     Mr. Khalid's guardian, his sister, told the agents that Mr. Khalid could not travel to meet with FBI agents alone because he was a minor.

73.     Instead, the FBI agents traveled to Columbus, Ohio where they interrogated Mr. Khalid for approximately two hours.

74.     FBI agents interrogated Mr. Khalid asked him about his residence, whether he knew individuals who wanted to cause harm to the U.S., and whether he was affiliated with any individuals or organizations who wanted to cause harm to the U.S.

75.     On March 28, 2019, Mr. Khalid learned he was on the No Fly List when he tried to return to the U.S. from Jinnah International Airport (KHI) in Karachi, Pakistan.

76.     Mr. Khalid was prevented from checking in online or at the kiosk in the airport. Rather, he was directed to an airline representative for further assistance.

77.     The airline representative called Defendants in order to obtain clearance to print his boarding pass and allow him to board his flight.

78.     An Emirates airline representative arrived at the desk and informed Mr. Khalid that CBP would not allow him to board his flight and he should contact his local U.S. consulate.

79.     When Mr. Khalid arrived at the consulate in Karachi, Pakistan, FBI agents interrogated him for nearly two hours.

80.     FBI agents interrogated Mr. Khalid about where he attended school, his whereabouts in Pakistan for the last seven years, whether he was familiar with Lashkar-e-Taiba, a terror group in Pakistan, and what mosques he frequented.

81.     FBI agents showed Mr. Khalid photos of different people and interrogated him about whether he or his family members knew any of them.

82.     The FBI agents instructed him to return to the U.S. consulate the next day for a second interview.

83.     On April 16, 2019, Mr. Khalid once again arrived at the U.S. consulate in Karachi, Pakistan. Consulate officers requested his passport and escorted him into a private room.

84.     FBI Agent Lee escorted Mr. Khalid into a backroom where he pulled out a list of names from a red folder and interrogated Mr. Khalid about the individuals on the list.

85.     Agent Lee also interrogated Mr. Khalid about a hostel where he stayed approximately seven years ago and whether he and his family had any marital problems with his wife.

86.     Agent Lee also requested to search Mr. Khalid's phone, which Mr. Khalid refused.

87.     Agent Lee then provided Mr. Khalid with a 24-hour deadline to provide additional information.

88.     Agent Lee also informed him that this would be their last meeting, and that he should file a DHS TRIP complaint to resolve his No Fly List issues. The U.S. consulate

did not provide Mr. Khalid with any information regarding his placement on the No Fly List.

89.     Since this ordeal, because of Mr. Khalid's watchlist designation, Mr. Khalid is unable to return to the United States and remains stranded abroad.

90.     Upon information and belief, Mr. Khalid was added to the No Fly List after he left the United States, and accordingly he was unable to board a flight to return to his home in the United States.

91.     Defendants have subjected Mr. Khalid to additional harms due to their unlawful placement of Mr. Khalid on their federal terror watchlist and No Fly List.

92.     In early 2019, Mr. Khalid's employer tasked him with a project valued at $600,000 which required Mr. Khalid to fly to the U.S. by April 26, 2019 to meet with Amazon representatives.

93.     Mr. Khalid was unable to complete the project because he was unable to return to the United States due to his placement on Defendants' No Fly list.

94.     Moreover, Mr. Khalid's employer tasked him with a $1.5 million project for Delta, requiring Mr. Khalid to travel to meet with representatives in the United States.

95.     Mr. Khalid was unable to complete the project because he was unable to return to the United States due to his placement on Defendants' No Fly list.

96.     On March 21, 2019, Mr. Khalid's employer offered him a job promotion as a "Business Development Consultant—America" based in their Mexico office.

97.     Due to Mr. Khalid's placement on Defendant's No Fly List, Mr. Khalid was unable to travel and was forced to resign his job and forego his promotion.

98.     In February 2020, Mr. Khalid received an employment opportunity requiring him to return to the U.S. in April for business meetings. This was a temporary position but could become permanent based on Mr. Khalid's performance.

99.     Due to Mr. Khalid's placement on Defendant's No Fly list, Mr. Khalid was unable to travel and lost yet another employment opportunity to support his wife and new-born daughter.

100.    Mr. Khalid's current employer does not want him in Pakistan. The company's shareholder agreement states that once Mr. Khalid is state side, 25% of company shares will be transferred to Khalid; Mr. Khalid cannot receive this while he remains in Pakistan. With his inability to travel, Mr. Khalid's placement on the No Fly list is preventing him from receiving funds necessary to support his family.

101.    In addition to the many employment opportunities Mr. Khalid has lost and continues to lose, Mr. Khalid's placement on Defendants' No Fly list and TSDB prohibits him from obtaining any government security clearances required by Mr. Khalid's employers. Thus, Mr. Khalid continues to be prevented from growing his career and obtaining financial security for his family.

102.    Moreover, Mr. Khalid risks detention and physical harm as a result of the dissemination of the TSDB and No Fly list to foreign countries.

103.    On July 16, 2019, Mr. Khalid's attorneys filed a DHS TRIP application on his behalf via electronic mail. DHS responded, "Due to our current backlog, it is taking a minimum of 8 months to process applications that were not submitted online."

104.    Nearly a year later, on April 6, 2020, DHS TRIP emailed Mr. Khalid inform-ing him they had made a final determination of his case. In the same email, a letter dated April 6, 2020, was attached, which confirmed Mr. Khalid was on Defendants' No Fly List.

105.    On April 6, 2020, Mr. Khalid's attorneys requested additional information about his placement on Defendants' No Fly List.

106.    To date, and despite follow up from his attorneys, Mr. Khalid has not received any additional information about his placement on Defendants' No Fly List.

107.    On August 13, 2019, Mr. Khalid filed an I-130 Petition for Alien Relative on behalf of his wife. Upon information and belief, as a result of his status on the TSDB and No Fly List, Mr. Khalid's I-130 immigration application will be significantly, if not perma-nently, delayed.

108.    Upon information and belief, when Mr. Khalid applies for immigration bene-fits for his daughter, that application will be similarly delayed because of his designation on the federal watchlist and his placement on the No Fly List.

109.    Mr. Khalid's inability to bring his wife and daughter to the United States means that he will have to decide whether to remain in Pakistan, where he is unable to support his family long-term due to a lack of a job opportunities and financial stability, or forcibly separate from his wife and daughter by returning to the United States.

110.    Due to the increased financial strain caused by Mr. Khalid's watchlist status and No Fly List, and because it is unlikely his immigration petitions will be processed, Mr. Khalid and his family have begun discussing having Mr. Khalid return to the United States without them.

111.    Upon information and belief, Mr. Khalid remains on the TSDB and the No Fly List.

## COUNT I
## VIOLATION OF THE FIFTH AMENDMENT
## (PROCEDURAL DUE PROCESS)

### 28 U.S.C. § 1331 and 5 U.S.C. § 702

112.    Plaintiff realleges and incorporates the allegations throughout this Complaint.

113.    Defendants' placement of Plaintiff on the No Fly List has interfered with and unreasonably burdened Plaintiff's ability to travel domestically and internationally and to return to the United States.

114.    Plaintiff has a protected liberty interest in traveling domestically and internationally to, from, within, or over U.S. airspace free from unreasonable burdens.

115.    Plaintiff only learned he was placed on the federal terrorist watchlist after being added on the watchlist and suffering harm as a result.

116.    Defendants' actions as described above in refusing to provide Plaintiff any notice of his placement deprived Plaintiff of constitutionally protected liberty interests.

117.    Plaintiff was denied boarding on commercial flights, promptly sought to challenge his placement on the No Fly List and is entitled to a constitutionally adequate Legal process that provides him notice of the reason and bases for his placement on the No Fly List and a meaningful opportunity to contest that placement. Defendants have deprived Plaintiff of a meaningful opportunity to contest that placement. Defendants have deprived Plaintiff of a meaningful opportunity to challenge his placement on the No Fly List through their unreasonable delay and failure to provide Plaintiff with (i) a full statement of the reason or bases on which Defendants relied to place and maintain him on the No Fly List; (ii)

the evidence supporting that placement; (iii) any exculpatory evidence Defendants possess; (iv) the opportunity to challenge his placement through a live hearing before a neutral decisionmaker; and (v) other procedures as Due Process may require.

118.    As described above, Plaintiff has experienced economic, reputational, and liberty harms due to his placement on the No Fly List.

119.    The stigma caused by Plaintiff being placed on the watchlist has caused Plaintiff injuries in the form of lost jobs and business opportunities, injury to social and familial relationships, and delay to the immigration status of family members.

120.    Plaintiff has the right to be free from false governmental stigmatization as an individual who is "known or suspected to be" a terrorist, or who is otherwise associated with terrorist activity. Defendants have officially imposed on Plaintiff the stigmatizing label of "known or suspected terrorists" without a constitutionally adequate legal mechanism for doing so.

121.    By failing to provide Plaintiff with a constitutionally adequate means to challenge placement on the No Fly List, Defendants have deprived Plaintiff of his protected liberty interests, and thus have violated Plaintiff's constitutional rights without affording him due process of law. Defendants will continue to do so if Plaintiff is not afforded the relief requested below.

122.    Plaintiff is entitled to declaratory relief that Defendant's actions constitute willful, intentional, and unlawful violations of the Fifth Amendment to the U.S. Constitution.

WHEREFORE, Plaintiff requests this Honorable Court grant relief in the form described in the Prayer for Relief below, plus all such other relief this Honorable Court deems just and proper, including costs and attorneys' fees incurred in this action.

## COUNT II
## VIOLATION OF THE FIFTH AMENDMENT
## (SUBSTANTIVE DUE PROCESS)

### 28 U.S.C. § 1331 and 5 U.S.C. § 702

123.    The foregoing allegations are realleged and incorporated herein.

124.    Substantive due process protects Americans' freedom from government action which infringes upon their fundamental constitutional rights. Government action which fringes upon these rights cannot be arbitrary and must be narrowly tailored to serve a compelling government interest.

125.    Plaintiff has constitutionally protected liberty interests in travel and freedom from government-imposed stigma.

126.    Defendants' conduct in placing and maintaining Plaintiff on the watchlist, without there being any reasonable suspicion that Plaintiff is a known, suspected, or potential terrorist, violates Plaintiff's right to substantive due process under the Fifth Amendment to the U.S. Constitution.

127.    Defendants lack a compelling government interest in placing innocent persons, such as Plaintiff with no prior terrorism related criminal record and no probable cause for suspicion of terrorism related crimes, on the federal terrorist watchlist.

128.    Defendants have thus violated Plaintiff's constitutional rights without affording him due process of law. Defendants will continue to do so into the future if Plaintiff is not afforded the relief demanded below.

129.   Plaintiff is entitled to declaratory relief that Defendant's actions constitute willful, intentional, and unlawful violations of the Fifth Amendment to the U.S. Constitution.

WHEREFORE, Plaintiff requests this Honorable Court grant relief in the form described in the Prayer for Relief below, plus all such other relief this Honorable Court deems just and proper, including costs and attorneys' fees incurred in this action.

## COUNT III
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## 5 U.S.C. §§ 702, 706

### 28 U.S.C. § 1331 and 5 U.S.C. § 702

130.    The foregoing allegations are realleged and incorporated herein.

131.    Defendants' actions in placing Plaintiff on the No Fly List, officially imposing on Plaintiff the stigmatizing label of "known or suspected terrorist" and providing no constitutionally adequate avenue for redress are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

132.    Defendants have failed to provide Plaintiff with notice of the reasons for his placement on the No Fly List and has failed to provide a meaningful opportunity for Plaintiff to contest his continued inclusion on the federal terrorist watchlist. Defendants' action is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

133.    Plaintiff is neither a known nor appropriately suspected terrorist, thus Defendants' conduct in placing him on the No Fly List is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and contrary to constitutional rights and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

134.    Plaintiff is entitled to declaratory relief that Defendant's actions constitute willful, intentional, and unlawful violations of 5 U.S.C. § 706.

WHEREFORE, Plaintiff requests this Honorable Court grant relief in the form described in the Prayer for Relief below, plus all such other relief this Honorable Court deems just and proper, including costs and attorneys' fees incurred in this action.

### COUNT IV
### VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT
### 42. U.S.C. § 2000bb *et seq.*

### 28 U.S.C. § 1331 and 42 U.S.C. § 2000bb(c)

135.    Plaintiff holds a sincere religious belief that he must perform Hajj, a pilgrimage to Mecca, Saudi Arabia, in accordance with the tenets of his Muslim faith. Defendants' conduct in placing Plaintiff on the No Fly List substantially burdens his religious exercise because it bans him from international travel for his religious purpose.

136.    Under RFRA Defendants cannot impose a substantial burden on Plaintiff's exercise of religion unless they can establish that the burden is the least restrictive means of furthering a compelling government interest.

137.    Defendants have no compelling interest in burdening Plaintiff's right to perform Hajj because Plaintiff is neither a known nor appropriately suspected terrorist and poses no threat to aviation security.

138.    As a result of Defendants' actions, Plaintiff suffers injury to his fundamental religious exercise rights protected by RFRA and will continue to suffer injury absent the relief requested below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgement in his favor and against Defendants, on each and every count in this Complaint, and enter an Order awarding the following relief:

1.   A declaratory judgment that Defendants have violated Plaintiff's rights under the Fifth Amendment to the United States Constitution, and the Administrative Procedure Act.

2.   An injunction that:

   A.   requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiff from any watchlist or database that burdens or prevents him from flying or entering the United States across the border;

   B.   enjoins Defendants from re-adding Plaintiff to the No Fly List on any future date based on the same reasons and evidence on which Plaintiff's placement is currently based;

   C.   enjoins Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from applying the No Fly List criteria to Plaintiff; and

   D.   requires Defendants to provide Plaintiff with a legal mechanism that affords him notice of the reasons and bases for his placement on the federal terrorist watchlist and a meaningful opportunity to contest his continued inclusion;

3.   An award of attorneys' fees, costs, and expenses of all litigation; and,

30

4.    Any further relief to which Plaintiff is entitled or that this Honorable Court

deems just and proper.

CAIR LEGAL DEFENSE FUND

BY:    /s/ Lena F. Masri
LENA F. MASRI (DC 100019)
GADEIR I. ABBAS (VA 81161) β
JUSTIN SADOWSKY (DC 977642)
ZANAH GHALAWANJI (MI P 83116) ∂ ç
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420
Fax: (202) 379-3317
Email: LDF@CAIR.COM

*Attorneys for Plaintiff*

*∂ Pro hac vice pending*
*β Licensed in VA, not in DC.*
*  Practice limited to federal matters.*
*ç Licensed in MI, not in DC.*
*Practice limited to federal matters.*

Dated:    August 31, 2021