## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SAAD BIN KHALID**,

*Plaintiff,*

v.

**MERRICK GARLAND**, et al

*Defendants.*

**Case No. 1:21-cv-02307-CRC**

**Hon. Judge Christopher R. Cooper**

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES.........................................................................................iii

INTRODUCTION ............................................................................................................1

BACKGROUND...............................................................................................................3

ARGUMENT.....................................................................................................................6

    I.   This Court has jurisdiction over all of Khalid's Claims...........................................6

        A.   Because DHS TRIP exhaustion is not required, Section 44610 cannot divest this Court of jurisdiction............................................................................................6

        B.   None of Khalid's challenges to Section 46110 are inescapably intertwined with a non-existent challenge to the TSA Administrator's decision itself. ..............................13

    II.   Khalid has stated a claim under the Procedural Due Process Clause.....................15

        A.   No Fly List placement impacts travel-related liberty interests covered by the Procedural Due Process Clause ..................................................................................15

        B.   Khalid's Stigma-Plus claim does not require dissemination to the general public. 18

        C.   Khalid has properly alleged that the Government provides inadequate process to No Fly List placements ............................................................................................21

    III.   The Government violated Khalid's right to substantive due process. ...................26

        A.   The freedom of movement is a fundamental right................................................26

        B.   The No Fly List interferes with Khalid's substantive rights, no matter how this Court decides to label them. .......................................................................................30

    IV.   The Government's No Fly List and watchlisting actions violate the APA............33

        A.   The Screening Center's creation and maintenance of the No Fly List and watchlist violates the APA...................................................................................................33

        B.   The DHS TRIP Process is arbitrary and capricious.............................................36

        C.   Khalid's own placement was arbitrary and capricious.........................................37

    V.   Khalid states a valid RFRA claim. .......................................................................38

        A.   Plaintiff has standing to bring his RFRA claim....................................................38

CONCLUSION ...............................................................................................................41

# TABLE OF AUTHORITIES

## Cases

10-cv-00750, 2016 WL 1239925, at *2 (D. Or. Mar. 28, 2016)...........................................20

554 F.3d 1170, 1188, *as amended* (9th Cir. Jan. 30, 2009)...........................................17, 18

562 U.S. 29 (2010)...................................................................................................17

*A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495, 530 (1935) .........................................33

*Alasaad v. Nielsen*, 2018 WL 2170323, at *10 (D. Mass. May 9, 2018) ..............................37

*Al-Watan v. Am. Airlines, Inc.*, 658 F. Supp. 2d 816, 825 (E.D. Mich. 2009) ......................34

*Amerijet v. DHS*, 43 F. Supp. 3d 4, 19 (D.D.C. 2014) ..................................................13

*Aptheker v. Sec'y of State*, 378 U.S. 500, 519 (1964) .........................................................27

*Board of Regents v. Roth*, 92 S. Ct. 2701 (1972)..............................................................19

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014) .........................................39

*Califano v. Aznavorian*, 439 U.S. 170, 177 (1978) .....................................................16, 27

*Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 295-96 (D.D.C. 2020)...............39

*Citizens for Legis. Choice v.* Miller, 144 F.3d 916, 922 (6th Cir. 1998)..................................34

*City of Rochester v. Bond*, 603 F.2d 927, 935 (D.C. 1979) ..................................................12

*City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 339 (1958) .......................................12

*Clancy v. Off. of For. Assets Control of U.S. Dept. of Treas.*, 559 F.3d 595, 604 (7th Cir. 2009).. 16

*Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ..............................................24

*Cramer v. Skinner*, 931 F.2d 1020, 1023 (5th Cir. 1991) ....................................................15

*Crandall v. State of Nevada*, 73 U.S. 35 (1867) ...............................................................26

*Crooker v. TSA*, 323 F. Supp. 3d 148, 157 (D. Mass. 2018) ..................................................6

*Darby v. Cisneros*, 509 U.S. 137, 146 (1993).....................................................................6

*Dearth v. Lynch*, 791 F.3d 32, 38 (D.C. Cir. 2015)............................................................16

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022) ........................24, 25, 28

*Doe v. Miller*, 405 F.3d 700, 713 (8th Cir. 2005) ..............................................................27

*Ege v. DHS,* 784 F.3d 791 (D.C. Cir. 2015)....................................................................6, 7

*El Ali v. Barr*, 18-cv-2415, 2020 WL 4051866, at *13 (D. Md. July 20, 2020) ...........6, 38, 39

*El Ali v. Barr*, 473 F. Supp. 3d 479, 508 (D. Md. 2020) ..........................................29, 30, 31

*Elhady v. Kable*, 391 F. Supp. 3d 562, 581 (E.D. Va. 2019)..........................................35, 37

*Elhady v. Kable*, 993 F.3d 208, 222 (4th Cir. 2021).....................................................18, 35

*Elhady v. Piehota*, 303 F. Supp.3d 453, 465-66 (E.D. Va. 2017) .........................................20

*Fikre v. FBI*, 35 F.4th 762, 774 (9th Cir. 2022)..................................................................8

*Garcia v. Pompeo*, 2020 WL 134865, at *6 n.2 (D.D.C. Jan. 13, 2020) ................................17

*Gibson v. Berryhill*, 411 U.S. 564, 575 (1973).................................................................6

*Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)..............................................40

*Haig v. Agee*, 453 U.S. 280, 287 (1981) ...............................................................16, 27, 29

*Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) ...................................................38

*Hernandez v. Cremer*, 913 F.2d 230, 238 (5th Cir. 1990) ...................................................27

*Hillmon v. Alameida*, 2005 WL 2030571, at *5 (E.D. Cal. Aug. 22, 2005) .........................40

*Howe v. Burwell*, 2015 WL 4479757, at *15 (D. Vt. July 21, 2015) ....................................40

*Hutchins by Owens v. D.C.*, 144 F.3d 798, 806 (D.C. Cir. 1999) .......................................... 25

*Ibrahim v. Dep't of Homeland Sec.*, No. C 06-00545 WHA, 2012 WL 6652362, at *8 (N.D.
Cal. Dec. 20, 2012)..................................................................................................................... 29

*Ibrahim v. DHS*, 2012 WL 6652362, at *7 (N.D. Cal. Dec. 20, 2012)................................. 15

*Jibril v. Mayorkas*, 20 F.4th 804, 812 (D.C. Cir. 2021) ......................................................... 9

*Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002) ......................................... 27

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019) .................................................................7, 22

*Kent v. Dulles*, 357 U.S. 116, 126 (1958) ............................................................................ 26

*King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) ......................... 27

*Kovac v. Wray*, 363 F. Supp. 3d 721, 747 (N.D. Tex. 2019) ................................................. 6

*Latif v. Holder*, 28 F. Supp. 3d 1134, 1149 (D. Or. 2014) ...........................................passim

*Long v. Pekoske*, 38 F.4th 417, 422 & n.3 (4th Cir. 2022)..................................................... 7

*Lutz v. City of York, Pa.*, 899 F.2d 255, 262 (3d Cir. 1990)................................................. 27

*Mahoney v. Doe*, 642 F.3d 1112, 1120 (D.C. Cir. 2011) ...................................................... 38

*Maniar v. Wolf*, 2020 WL 1821113, at *4 (D.D.C. Apr. 10, 2020)...................................... 11

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)................................................................... 23

*Merritt v. Shuttle, Inc.*, 245 F.3d 182, 187 (2d Cir. 2001) ................................................... 12

*Mistretta v. U.S.*, 488 U.S. 361, 372 (1989)......................................................................... 33

*Mohamed v. Holder*, 2011 WL 3820711, at *6 (E.D. Va. Aug. 26, 2011) ........................... 13

*Mohamed v. Holder,* 2015 WL 4394958, at *2 (E.D. Va. July 16, 2015) .......................19, 28

*Mohamed v. Holder*, 266 F. Supp. 3d 868, 879-80 (E.D. Va. 2017)...............................passim

*Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014)...............................................6, 20

*Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010) ........................................................... 18

*Paul v. Davis*, 424 U.S. 693 (1976)................................................................................16, 17

*Pope v. Williams*, 193 U.S. 621, 624 (1904) ....................................................................... 27

*Reno v. Flores*, 507 U.S. 292, 302 (1993) ........................................................................... 24

*Rochin v. California*, 342 U.S. 165, 170 (1952) ................................................................... 25

*Sabir v. Williams*, 37 F.4th 810, 821 (2d Cir. 2022) ............................................................ 39

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ......................................................................... 27

*Shqeirat v. U.S. Airways, Inc.*, 515 F.Supp.2d 984, 1004 (D. Minn. 2007).......................... 34

*Southold v. East Hampton*, 477 F.3d 38 (2d Cir. 2007) ....................................................... 15

*State of Kan. v. United States*, 16 F.3d 436, 441 (D.C. Cir. 1994)........................................ 26

*Swedish Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 88 (D.D.C. 2010) ...........................35, 36

*Tandon v. Newsom,* 141 S. Ct. 1294, 1298 (2021)................................................................ 31

*Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1275 (D. Or. 2014) ................................................ 18

*Townsend v. Vallas*, 256 F.3d 661, 669 (7th Cir. 2001) ....................................................... 18

*United States v. Guest*, 383 U.S. 745, 757-58 (1966) ........................................................... 29

*United States v. Matthews*, 419 F.2d 1177, 1193 (D.C. Cir. 1969)....................................... 26

*United States v. Salerno*, 481 U.S. 739, 746 (1987) ............................................................. 25

*Washington All. of Tech. Workers v. DHS*, 892 F.3d 332, 343 (D.C. Cir. 2018) ................... 33

*Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)...............................................24, 25, 30

*Williams v. Fears*, 179 U.S. 270, 274 (1900) ...................................................................... 26

iv

*Wilwal v. Nielsen,* 346 F. Supp. 3d 1290, 1302 (D. Minn. 2018) .......................................... 37

*Worthy v. US*, 328 F.2d 386, 394 (5th Cir. 1964) ............................................................... 27

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ....................................... 32

**Statutes**

49 U.S.C. § 44903 ................................................................................................... 32, 33

49 U.S.C. § 44926 ................................................................................................ 6, 10, 35

5 U.S.C. § 706 ........................................................................................................ passim

## INTRODUCTION

In this challenge to the No Fly List, the Government makes some extraordinary claims that have never been accepted, as far as Saad bin Khalid can tell, by any Court. Among these novel, often contrary-to-precedent arguments are:

- Challenges to the No Fly List and watchlist cannot be brought in the District Court, regardless of whether the challenge is to the actions of the Terrorist Screening Center, the FBI, the DHS Secretary, or the TSA Administrator, because the Government routed certain pro forma determinations to the TSA Administrator without Congressional authority;

- US citizens such as Khalid have no "liberty," as the Fifth and Fourteenth Amendment define that term, in traveling by air either interstate or internationally and that any liberty deprivation, no matter how poorly tailored, is constitutionally sanctioned as a matter of law simply because the Government invokes the phrase "national security"

- Stigma-plus due process claims require dissemination not just to third parties but to the public at large;

- District Courts can decide APA arbitrary-and-capricious claims at the Motion to Dismiss stage in the absence of any administrative record; and

- In order to allege a RFRA claim, Khalid must do more than allege a substantial burden such as prohibiting a Muslim from flying to Mecca for hajj; rather, an individual must engage in fruitless and expensive conduct to show, beyond the ordinary sincerity test, to prove substantial burden.

The reason the Government is taking such an aggressive stand in this case may be because this case provides almost the perfect illustration as to why the No Fly List is a broken and unlawful system. The United States government is punishing Khalid for the mere crime of being the child of an American mother and a Pakistani father, and then having his parents engage in a rough custody dispute when he was a child. During this custody dispute, Khalid's mother told the United States government made up stories about Khalid's father being associated with terrorism in an attempt to get Khalid back.

1

His mother's gambit failed at getting Khalid back. Instead, the overly credulous Government decided to ruin Khalid's life. The Government placed Khalid on the No Fly List, preventing him from returning to the United States—where he is a citizen—for years. After filing this suit, the Government gave him a one-time waiver allowing him to fly home. But now that he is home, he still cannot fly. As a result, Khalid's career is imperiled and constrained. And so is his ability to leave the United States for Pakistan to be with his wife and child to welcome a baby to their family and then later return to this country to support the family he loves so much.

But that is not all. Because of other effects of watchlist placement he cannot successfully petition the Government to allow his wife and kids to live with him in the United States, despite the fact that this too, is by statute a matter of right. And all of this, because of a lie that only the willingly credulous could possibly believe.

Worse, as this case shows, the Government has given Khalid no effective recourse at all. Khalid was not given any useful information about the charges or the evidence the Government relied on in putting him on the watchlist and maintaining him there for over a decade. So when Khalid relied on the only form of process the Government suggests exist to challenge No Fly List placement—DHS TRIP—he was unaware about the false information the Government had relied on and was unable to rebut the Government's secret evidence. It was only by happenstance (in part due to the Government's continued interrogation and harassment of him) that Khalid discovered the story that led to his placement. But even if the Government (or a Court reviewing the Government's decision) were willing to consider this information, it simply came too late.

And so Khalid has shown the inevitable result of the No Fly List placement—individuals are put on the No Fly List and the broader watchlist for no good reason at all, and cannot get off it simply because they are not even told what flimsy evidence put them on in the first place.

The system does not protect national security. It only destroys innocent lives.

## BACKGROUND

Saad bin Khalid is a Muslim natural born United States citizen, the son of a Pakistani father and a non-Muslim American mother. Amended Complaint ("AC"), Dkt. 17, ¶¶ 7, 131. As a child, his mother had legal custody under U.S. law, but he nevertheless resided in Pakistan with his father. *Id.* ¶ 131. Unbeknownst to him at the time, sometime around 2008 and 2010 (when Khalid was around 14 years old, more or less), his mother reached out to the FBI and fabricated information about Khalid and his father in order to advance her attempts to have Khalid return to her. *Id.* ¶ 133. His mom has a habit of concocting false stories, and then forgetting the details. *Id.* ¶ 134. His mom likely told the FBI a story that she believed her ex-husband was sending Mr. Khalid to training facilities in Pakistan. *Id.* ¶ 132. These are, to be clear, all lies, and Khalid's mom does not remember what she said—nor does she have any belief that Khalid is involved in terrorism in any way. *Id.* ¶¶ 133, 136.

Likely because of these lies, the Government would at some point place Khalid on the watchlist and the No Fly List. *Id.* ¶ 137.

A few years later, when Khalid was still a 16 or 17 year old minor, Khalid travelled from Karachi, Pakistan back to the United States. *Id.* ¶ 68. He was given secondary screening, interrogated by CBP upon arrival, had his cell phone searched, and let into the United States.

FBI agents then came to his house and interrogated him further. *Id.* ¶¶ 72-80. He later returned to Pakistan. *See id.* ¶ 81.

Seven years later, in 2019, when he tried to again return to the United States, Khalid discovered he was on the No Fly List. AC ¶ 81-93. He initiated a DHS TRIP process, but that process stopped without conclusion when—in April 2020—Khalid asked for the reason he was placed on the No Fly List, and the Government simply did not respond. *Id.* ¶ 9.

A little over a year later, in August 2021, Khalid filed this lawsuit. Dkt. No. 1. After the filing of the lawsuit, at the request of Khalid's attorneys, the Government allowed Khalid to board a plane and return to the United States while he was on the No Fly List. *See* AC ¶ 117 (Khalid back in the United States). The Government further sought an extension on their time to respond until January 25, 2022. Dkt. No. 8. Three days before that response was due, the Government finally responded to Khalid's DHS TRIP inquiry. AC ¶ 113. The Government's explanation, in full, for Khalid's placement was:

> You are on the U.S. Government's No Fly list because the U.S. Government continues to have concerns about your association with a known terrorist organization. The information you shared during your March 27, 2012, interview with FBI Special Agents regarding your contacts and activities in Pakistan from 2008 to 2012 did not assuage the U.S. Government's concerns. In particular, the U.S. Government has continuing concerns relating to your candor during this interview.

*Id.*

Khalid attempted to respond. AC ¶¶ 115-116. He pointed out that he had no idea what association with a known terrorist organization the Government was possibly referring to and pointing out the silliness of relying on his "candor" in interrogation he undertook without any counsel present a decade prior when he was a minor. *Id.*

4

In the midst of this administrative process, on April 15, 2022, the Government also came to Khalid's house, coerced him into going to an FBI office, confiscated and downloaded his phone, and interrogated him by polygraph. AC ¶¶ 117-128. Though the FBI knows that Khalid is represented by counsel, this behavior went on until the FBI agents acquiesced to Khalid's demand that they respect his right to not participate in the process and return his phone. *Id.* ¶¶ 129-130.

The Government then issued a final order by the TSA Administrator adopting the recommendations of the Terrorist Screening Center to keep Khalid on the No Fly List. AC ¶ 140. The TSA Administrator simply adopting the Screening Center's recommendation makes sense. While the TSA Administrator has the final authority under DHS TRIP to re-move DHS TRIP applicants from the No Fly List, the Screening Center has the independent authority to both place and remove people from the No Fly List. *See* AC ¶¶ 52, 54, 56. And so were the TSA Administrator to disagree with the Screening Center's recommendation, the Screening Center would have the authority (and the duty) to execute its recommendation thereafter regardless of what the TSA Administrator did. So there would be no point in the TSA Administrator rejecting the Screening Center's final recommendation.

Sometime after Khalid submitted his response, Khalid—who was trying to investigate the reasons the Government listed him, as reflected in the questions the FBI demanded he answer during the April 2022 interrogation—learned from his siblings that his mother had spoken to the FBI and told them false stories about him and his father back when Khalid was a minor. AC ¶ 132. Khalid, via counsel, reached out to his estranged mother; she admitted speaking to the FBI, but while she "remember[s] discussing his situation of being pressured and expressed that I wanted him to stay not knowing what he was returning to," she had "no

idea what I may have said or what may have been misinterpreted by the agents that is now the result that Saad is on the No Fly List and is unable to see the birth of his son and be certain of the health of his now pregnant wife and little daughter." *Id.* ¶ 136. Khalid's mother further elaborated that she knew nothing of relevance about any of Khalid's father's friends or associates when she spoke to the FBI. *Id.*

Khalid remains on the No Fly List. AC ¶ 97. He remains—at the time of this filing— unable to board a plane to go back to Pakistan to be with his wife and family as they welcome a baby due in days *Id.* Due to his No-Fly-List status, his wife has not yet received the visa that would allow Khalid and his family to live together in the United States. *Id.* ¶ 143. And he remains unable to take flights necessary for basic employment as a business project manager and business development consultant. *Id.* ¶¶ 103-104.

**ARGUMENT**

I. **This Court has jurisdiction over all of Khalid's Claims**

    A. **Because DHS TRIP exhaustion is not required, Section 44610 cannot divest this Court of jurisdiction.**

        1. **Section 44926 does not mandate exhaustion of DHS TRIP.**

Nothing in 49 U.S.C. § 44926 makes DHS TRIP the exclusive method for removing individuals from the No Fly List or otherwise requires Khalid and other listees to use it. And the agency rules implementing DHS TRIP follow Section 44926's lead and do not require Khalid to use DHS TRIP. *See Mohamed v. Holder*, 995 F. Supp. 2d 520, 534 (E.D. Va. 2014) ("as the defendants acknowledge, Congress has not mandated exhaustion of the DHS TRIP… and there are no regulations regarding DHS TRIP that mandate exhaustion.")

In this situation, with regards to Khalid's APA claims, the Supreme Court has left this court with no discretion. Under *Darby v. Cisneros*, 509 U.S. 137, 146 (1993), an "exhaustion

6

requirement" must be "unambiguous so that aggrieved parties would know precisely what administrative steps were required before judicial review would be available." Here, the APA sets out the terms that must be met for any APA claim to be subject to an exhaustion requirement and explicitly forbids federal courts from imposing an exhaustion requirement unless those specific conditions not present here are met. *See Darby,* 509 U.S. at 154 (Section § 10(c) of the APA "has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates" and where "administrative action pending that review is made inoperative"). There is neither a statute nor a rule that requires Khalid to exhaust DHS TRIP. And even if there was such a requirement in a statute or an agency rule, the APA and *Darby* would forbid this Court from imposing an exhaustion requirement because the Government's decision to list Khalid was not "inoperative" pending the conclusion of an administrative process. *Id.* On the contrary, the listing decision began ruining his life as soon as it was made.

The majority of courts that have looked at this issue have found that DHS TRIP exhaustion is not a prerequisite to challenging various secret lists the Government maintains. *See Mohamed* 2014, 995 F. Supp. 2d 520; *Crooker v. TSA*, 323 F. Supp. 3d 148, 157 (D. Mass. 2018); *Kovac v. Wray*, 363 F. Supp. 3d 721, 747 (N.D. Tex. 2019); *El Ali v. Barr*, 18-cv-2415, 2020 WL 4051866, at *13 (D. Md. July 20, 2020). And when it comes Khalid's APA claims, which provide a procedural vehicle for all the constitutional and statutory claims brought here, this Court has no discretion. Khalid's APA claims, as *Darby* held, are subject to review right now. *See Mohamed 2014*, 995 F. Supp. 2d at 534 ( because "the Court could not, under the holding in *Darby v. Cisneros*, require Mohamed to exhaust the DHS TRIP," imposing an

exhaustion requirement on Khalid's non-APA claims would "bifurcate substantially related, if not common, claims and create, rather than avoid, piecemeal litigation.").

If exhaustion cannot be required, then the Government does not deprive district courts of jurisdiction over challenges to the No Fly List by—without Congressional authorization—-arbitrarily inserting the TSA Administrator as a rubber stamp on the final decision of the Screening Center. Khalid can pursue his claims against the TSC (and the TSA more broadly) without taking any action requiring a decision by the TSC Administrator at all.

The D.C. Circuit explained the nub in *Ege v. DHS,* 784 F.3d 791 (D.C. Cir. 2015). Because Khalid is on the No Fly List, he "cannot board or pilot flights destined for the United States. If his alleged [watchlist] status remains unchanged, it is possible that one of several other federal agencies could use the [watchlist] to prevent [Khalid] from crossing the U.S. border." *Id.* at 796.

Here, the TSA has the authority to remove Khalid from the No Fly List—but not the greater watchlist—solely as a result of the DHS TRIP process. But TSA does not exclusively have that authority. The Screening Center has that authority as well, as a recent case illustrated. In *Long v. Pekoske,* a similar case dealing with the same exclusive jurisdiction arguments the Government makes here, the Screening Center voluntarily removed a citizen from the No-Fly List just as the TSA's brief to the Fourth Circuit was due in. *See Long v. Pekoske*, 38 F.4th 417, 422 & n.3 (4th Cir. 2022). (The Screening Center did so after the TSA Administrator decided against delisting and just as the agency's brief to the Fourth Circuit was due.)

And the Screening Center has the (sole) authority to replace Khalid on the No Fly List. *See id.* (noting that it was the Screening Center that pledged it would not place Long back on

the No Fly List). Only if the claims in this case are against the Screening Center—over which the Circuit Court has no authority under Section 46110—can Khalid get the relief he seeks.

   **2.   No Court has held that Section 46110 divests the Court of jurisdiction to hear No Fly List Challenges other than the specific decision of the TSA Administrator not to remove a listee at the end of DHS TRIP.**

   The only Court to find that Section 46110 now deprives the Court of hearing any sort of as-applied challenge involving the No Fly List was the Ninth Circuit in *Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019). *Kashem* held "that § 46110 grants the courts of appeals, rather than the district courts, exclusive jurisdiction over the plaintiffs' substantive due process claims" in that case. *Id.* at 391. To be clear, the substantive due process claims in that case were different than the ones here. In that case, the substantive due process claims merely challenged "the substantive decision in the final TSA order" to maintain the plaintiffs on the No Fly List." *Id.* at 391 n.16. The Complaint in *Kashem* confirms. Ex. A (*Kashem* Complaint). And so *Kashem* reflects the relative narrowness of the claims adjudicated there versus the claims here. *Kashem*, 941 F.3d at 364 ("we decline to reach the plaintiffs' facial vagueness challenges").

   Khalid's constitutional and statutory claims, in contrast, are broader. As the Amended Complaint explains, for example, "Defendants lack a compelling government interest in placing innocent persons, such as Plaintiff with no prior terrorism related criminal record and no probable cause for suspicion of terrorism related crimes, on the federal terrorist watchlist." AC ¶ 168. Indeed, the fact that Khalid, while on the No Fly List, was able to take a flight from abroad to the United States just months ago is dispositive evidence that the list's flight ban is not narrowly tailored as a facial matter. AC ¶ 117 (showing Khalid is back in the United States). Despite finding the as-applied substantive due process claims subject to Section 46110, the Ninth Circuit in *Kashem* affirmed that claims that "challenge the sufficiency of the

revised DHS TRIP procedures administered by the Screening Center" properly remain in District Court. *Kashem*, 941 F.3d at 391 n.16.

The Ninth Circuit thereafter held in *Fikre v. FBI* that Section 46110 only applies in No Fly List cases to the extent the party is challenging "the TSA Administrator's decision refusing to remove him from the No Fly List under the DHS TRIP process." *Fikre v. FBI*, 35 F.4th 762, 774 (9th Cir. 2022). Fikre's claims could proceed in the district court because Fikre was challenging "the Screening Center's decision to place him on the No Fly List in the first place." *Id.* So too here. Khalid is challenging his placement along with the Screening Center's decision to maintain him on the No Fly List all these years. Indeed, at the time the Complaint was filed, Khalid had not yet obtained a final decision from the TSA Administrator under the revised DHS TRIP process. It naturally follows that Khalid is not challenging any decision of the TSA Administrator in this case.

The Government suggests (at 15, citing AC ¶ 167) that Khalid's allegation against "Defendants' conduct in placing ***and*** maintaining Plaintiff on the watchlist," means that Khalid is somehow exclusively challenging the decision of the TSA Administrator, and that this allegation distinguishes this case from *Fikre*. Hogwash. In *Fikre*, Fikre alleged that "Defendants' actions in placing and keeping Plaintiff on the FBI-maintained, secret TSDB and No Fly List substantially interfered with and deprived Plaintiff of his liberty interest in international travel." Ex. B (Fikre Seventh Amended Complaint) at ¶¶ 168 & 170; *see also id.* at ¶¶ 8, 31, and 41 (accusing the Screening Center of maintaining Plaintiffs and others on the No Fly List and watchlist). There is no meaningful distinction between "placing and keeping" allegation there and the "placing and maintaining" allegation in here. *See also* AC at ¶ 43. Even Khalid's allegations about DHS TRIP do not challenge actions of the TSA Administrator. Instead,

they challenge the Screening Center's and DHS's failure to use the least restrictive means or provide Khalid with adequate due process prior to the TSA Administrator's final decision. AC ¶ 158.

On top of all that, Khalid challenges not only his placement on the No Fly List but also his placement on the broader watchlist. *See also Jibril v. Mayorkas*, 20 F.4th 804, 812 (D.C. Cir. 2021) (allowing case to proceed despite DHS TRIP process because remaining on the list "exposes them to an imminent risk of invasive and undue Government actions that they plausibly allege the [DHS] TRIP process will not prevent."). The TSA Administrator has no authority—none—to remove someone from the broader watchlist. That authority remains solely with the Screening Center. As Paragraph 22 of the Amended Complaint provides in detail, the reasons the TSA Administrator is sued in his official capacity in this case is not because of the TSA Administrator signing off on any Order covered by Section 46110, but because of the TSA's more general role in (a) potentially nominating Khalid to the No Fly List and broader watchlist, and (b) administering the No Fly List and watchlist in various ways, including denying Khalid the ability to board an aircraft. Indeed, at the time Khalid filed the initial complaint, the TSA Administrator had not even taken any action as it relates to Khalid's DHS TRIP application. And, because the DHS TRIP process is not mandatory and need not be exhausted prior to filing suit, this lawsuit could have continued to go forward without Khalid having appealed that process to the TSA Administrator. The Government should not be able to use Khalid's good faith in seeing the DHS TRIP process to the end as an excuse to deprive this Court of jurisdiction.

Finally, the Government suggests (at 2) that TSA "establish[ed] the DHS TRIP process," so that challenges to the DHS TRIP process are challenges to the TSA Administrator

11

covered under Section 44610. But that is not right, either. 49 U.S.C. § 44926(a) states that the "[t]he Secretary of Homeland Security shall establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration." The Secretary of Homeland Security is not the TSA Administrator. To the extent the TSA Administrator, rather than DHS Secretary, enacted the statutes, they are void under the APA for lack of authority. 5 U.S.C. § 706(2)(C). And so Khalid may still bring suit against DHS (as it has here) for overseeing the DHS TRIP process, no matter how TSA and DHS attempt to avoid judicial review by using the happenstance of Section 46110.

And even if challenges to DHS TRIP processes were challenges to decisions of the TSA Administrator, they would not be challenges to decisions covered under Section 44610. That is because Section 46110 applies to final decisions by "the Secretary of Transportation (or the Administrator of the Transportation Security Administration)" only "with respect to security duties and powers designated to be carried out by the Administrator." It does not apply to decisions of the TSA Administrator with respect to decisions designated to be carried out by the Secretary of Homeland Security. So, contrary to the Ninth Circuit's decision in *Kashem*, Section 44610 would not apply to the decision by the Screening Center Administrator to rubber stamp the Screening Center's decision not to remove Khalid from the No Fly List, even if Khalid was challenging that decision in this case.[1]

---

[1] To the extent Section 46110 is at all ambiguous, both the nondelegation doctrine, *Mistretta v. U.S.*, 488 U.S. 361, 371 (1989), and the Major Questions Doctrine, *W. Va. v. EPA*, 142 S. Ct. 2587, 2609 (2022), prevent executive agencies from interpreting Section 46110 in a way that allows other agencies eliminate district court review by delegating their own delegated power to the TSA Administrator.

In sum, Khalid's constitutional and statutory claims—which are against the Screening Center's processes for placing and maintaining Khalid on the No Fly List and broader watchlist, as well as how TSA and others use that placement to punish Khalid—belongs in this Court. Section 46110 does not apply to either the Screening Center's internal processes and standards or to procedural challenges to the DHS TRIP process. *See also Maniar v. Wolf*, 2020 WL 1821113, at *4 (D.D.C. Apr. 10, 2020) (Section 46110 does not divest jurisdiction to the extent that Plaintiff challenges procedures other than the final decision of the TSA Administrator). And Section 46110 certainly does not apply to non-TSA agencies using the status the Screening Center assigned to Khalid as an ongoing basis for punishing him.

### B. None of Khalid's challenges to Section 46110 are inescapably intertwined with a non-existent challenge to the TSA Administrator's decision itself.

Having failed to show that Section 46110 vests exclusive jurisdiction of any, much less all, of the claims in this case before the Court of Appeals, the Government claims (at 19) the same result is required under the doctrine of inescapable intertwinement. As the D.C. Circuit explained in *Ege*, this is a doctrine that Courts sometimes use "to review a claim not expressly included in a jurisdictional grant." 784 F.3d at 796.

But not all claims. "A claim is inescapably intertwined in this manner if it alleges that the plaintiff was injured by such an order and that the court of appeals has authority to hear the claim on direct review of the agency order." *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 187 (2d Cir. 2001). Other "[a]ctions which are not (or not yet) orders but which are nonetheless reviewable may be raised in the district court." *City of Rochester v. Bond*, 603 F.2d 927, 935 (D.C. 1979). Thus, what may and may not be heard by a district court in light of the exclusivity provision of § 46110 depends in part upon whether the claim in the district court "'could have ... been' presented to and decided by a court of appeals" in its § 46110 review of an agency

13

order. *Merritt*, 245 F.3d at 188 (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 339 (1958)).

Essentially, inescapable intertwinement can only exist when there is exclusive jurisdiction in the Court of Appeals over one claim in the case, and permissive jurisdiction over other claims. Here, since Section 46110 does not provide exclusive (or any) jurisdiction over any of Plaintiffs' claims, the other claims cannot possibly be covered under inescapable intertwinement. Even if there was a claim covered under Section 46110, the Court of Appeals' jurisdiction under Section 46110 does not exist over the claims against the Screening Center, the claims against the DHS Secretary, or the claims against the TSA in terms of how it uses the No Fly List and broader watchlist.

The Government (at 19) argues that this case is different than *Ege* because Plaintiff has brought a claim here against the Screening Center because the Screening Center is a party. But the Screening Center is only a party in this claim before the District Court. The Screening Center would not be a party in a claim brought under Section 46110, which gives the Courts of Appeal no authority (exclusive or not) against the Screening Center or the Department of Justice that oversees the Screening Center.[2]

The Government separately argues (at 20) that *Ege* does not apply because Khalid can obtain "full and complete relief from the TSA." Even were that true, it would be irrelevant—just because Khalid can obtain complete review from the TSA does not mean he cannot obtain relief from the Screening Center, nor does it mean that the relief he seeks against the TSA Administrator is limited to the overturning of a final order covered by Section 46110. But it

---

[2] The Screening Center has never been authorized by any Congressional statute. *See* § IV(A)(2), below.

14

is not true anyway. The TSA Administrator can neither remove Khalid from the broader watchlist nor prevent the Screening Center from putting Khalid back on the No Fly List. So any relief Khalid gets from the TSA Administrator would be necessarily incomplete.

And *Amerijet v. DHS*, 43 F. Supp. 3d 4, 19 (D.D.C. 2014), is a different case entirely. There, Amerijet's challenges to DHS were collateral attacks on an FAA Security Directive that rose or fell on whether the Security Directive complied with the FAA, which the parties agreed was covered under the exclusive jurisdiction of the court of appeals under Section 46110. *Id.* at 18. To the extent *Amerijet* analogized to the No Fly List in *Mohamed v. Holder*, 2011 WL 3820711, at *6 (E.D. Va. Aug. 26, 2011), the Fourth Circuit in *Mohamed* later reversed the District Court's application of the inescapable intertwinement doctrine there, finding the District Court had jurisdiction. Ex. C.

## II.   Khalid has stated a claim under the Procedural Due Process Clause

### A. No Fly List placement impacts travel-related liberty interests covered by the Procedural Due Process Clause

Every court to decide the issue has determined that being put on the No Fly List infringes on a travel-related liberty interest protected by the Due Process Clause. *See, e.g., Latif v. Holder*, 28 F. Supp. 3d 1134, 1149 (D. Or. 2014); *Mohamed v. Holder*, 266 F. Supp. 3d 868, 879-80 (E.D. Va. 2017). That is because "placement on the No–Fly List is a significant impediment to international travel. It is undisputed that inclusion on the No–Fly List completely bans listed persons from boarding commercial flights to or from the United States or over United States airspace." *Latif*, 28 F. Supp. 3d at 1149. "The effect of the No Fly List on the fundamental right of interstate travel is at least as great as other effects on fundamental rights found to constitute significant interference." *Mohamed 2017*, 266 F. Supp. 3d at 879-80.

Similarly, "[the Screening Center] shares watch-list information with [more than 60] foreign governments, and United States Customs and Border Protection makes recommendations to ship captains as to whether a passenger poses a risk to transportation security." *Latif*, 28 F. Supp.3d at 1149; *Elhady v. Kable*, 391 F. Supp. 3d 562, 570 (E.D. Va. 2019), *rev'd on other grounds*, 993 F.3d 208 (4th Cir. 2021) (noting now more than 60). So, as the *Latif* Court explained, "having one's name on the watch list can also result in interference with an individual's ability to travel by means other than commercial airlines as evidenced by some Plaintiffs' experiences as they attempted to travel internationally or return to the United States by sea and by land." *Id.*

The Government claims the Second, Fifth, and Ninth Circuits "have all recognized that a traveler does not have a constitutional right to the most convenient form of travel, such as traveling by airplane as opposed to by car or train." But as *Latif* and *Ibrahim v. DHS* both explained, "the fact remains that for international travel, air transport in these modern times is practically the only form of transportation." *Latif*, 28 F. Supp.3d at 1148 (quoting *Ibrahim v. DHS*, 2012 WL 6652362, at *7 (N.D. Cal. Dec. 20, 2012). As a result, in the Ninth Circuit, it is incorrect that "all modes of transportation must be foreclosed before any infringement of an individual's due-process right to international travel is triggered." *Latif,* 28 F. Supp.3d at 1149. Likewise, none of the cases in any of the three Circuits "deal with a ***complete ban*** on any particular mode of travel, such as that which the List imposes." *Mohamed 2017*, 266 F. Supp. at 879 (emphasis added).

The Second and Fifth Circuit cases are even further afield; to the extent they are relevant, they indicate the Government's Motion to Dismiss should be denied. *Southold v. East Hampton*, 477 F.3d 38 (2d Cir. 2007), accepted a constitutional right to travel, but at summary

judgment, found a rule limiting the use of ferries was nevertheless constitutional under the dormant commerce clause and equal protection clauses because it did not discriminate between interstate and intrastate ferries. The discriminatory effect of No Fly List placement here against Khalid is both obvious and intended. *Cramer v. Skinner*, 931 F.2d 1020, 1023 (5th Cir. 1991), involved a dispute over the Love Field Amendment, a law that limited service at Love Field Airport in order to provide a preference to Dallas-Fort Worth International Airport. The Court held that the right to interstate travel did not mean that an individual customer had a right to a more convenient airport between the two airports in the Dallas-Fort Worth area. *Id.* at 1030-31. This was deemed a "[m]inor restriction." *Id.* Even then, the Court only found the Love Field Amendment constitutional because "[t]he amendment does not deter Cramer from travelling by air, and the statute's history shows that its purpose was not to impede travel but to carry out an agreement thought necessary to benefit the region's travelers by consolidating service at DFW." *Id.* at 1031. Khalid, in contrast, is very much deterred from travelling by air, which is the No Fly List's purpose.

The Government (at 22) concedes that the right to travel internationally is covered by the Due Process Clause but goes on to argue that it may be curtailed for national security reasons. That may be true to some extent (though not to the extent the Government seems to suggest), but none of that indicates that the Government's claim of national security allows them to deny Khalid the right to travel internationally by plane without sufficient due process. *Haig v. Agee*, 453 U.S. 280, 287 (1981), merely held after summary judgment that the process provided in that case—including notice and a post-revocation hearing—was sufficient. *Califano v. Aznavorian*, 439 U.S. 170, 177 (1978), suggests that a minor, generally applicable "incidental effect" on international travel does not trigger substantive due process protections,

but the No Fly List's flight ban directly effects international travel by depriving Khalid (and only Khalid and others on the No Fly List) of the primary and common means citizens use to travel overseas. The Government's citation to *Dearth v. Lynch*, 791 F.3d 32, 38 (D.C. Cir. 2015), is to a dissent's dicta about a wholly unrelated issue about gun possession, and referring solely to the substantive as opposed to procedural due process clause. *Clancy v. Off. of For. Assets Control of U.S. Dept. of Treas.*, 559 F.3d 595, 604 (7th Cir. 2009), like *Califano*, involve challenges to generally applicable restrictions on international travel (there, to particular countries), that create incidental, rather than direct, effects on a person's ability to travel. *See generally* § III, below. And, in any event, the balancing of Khalid's rights and the national security interests of the United States requires this Court to undertake a "fact-intensive consideration of the personal liberties involved, the government's compelling interest in combating terrorism, the procedures used in connection with the No Fly List, and the use made of the No Fly List" that is particularly inappropriate to decide at the motion to dismiss stage. *Mohamed* 2104, 995 F. Supp. at 539.

### B.  Khalid's Stigma-Plus claim does not require dissemination to the general public.

The No Fly List also protects Khalid's reputational liberty interest under the stigma-plus test of *Paul v. Davis*, 424 U.S. 693 (1976). That test, as the Government correctly states, requires a plaintiff to show they "(1) suffered a stigma from governmental action; plus (2) experienced an alteration or extinguishment of "a right or status previously recognized by state law." Defs.' Mot. to Dismiss at 23 (citing *Paul*, 424 U.S. at 711).

The Government does not argue that being declared a terrorist is somehow not stigmatizing. The Government instead argues that is that disclosure was not to the "general public." But as *Garcia v. Pompeo*, 2020 WL 134865, at *6 n.2 (D.D.C. Jan. 13, 2020), explains,

only the different "reputation-plus" test requires disclosure to the general public. The stigma-plus test, in contrast, merely requires dissemination to a third party in relation to the change in status. *Paul*, 424 U.S. at 720. That is why *Paul* and cases applying it talk of dissemination as opposed to publication.

In *Humphries v. Los Angeles*, for instance, the Ninth Circuit found that a state sex offender registry that some state- contracted or licensed third parties would screen job applicants against was tantamount to a stigma-plus disclosure:

> [First, certain] benefits are explicitly conditioned on the agency checking the [list] and conducting an additional investigation. Second, information in the [list] is specifically made available to other identified agencies: state contracted licensing agencies overseeing employment positions dealing with children, persons making pre-employment investigations for peace officers, child care licensing or employment, adoption, or child placement, [among other entities].

554 F.3d 1170, 1188, *as amended* (9th Cir. Jan. 30, 2009), *rev'd on other grounds*, 562 U.S. 29 (2010) (citations omitted and emphasis added). So *Humphries* specifically relied on the fact that disclosure was simply to some third parties, rather than the general public, in order to find dissemination.

And it is clear that the Government does disseminate this information to third parties, including airlines, police, foreign countries, and certain private entities. AC ¶¶ 24, 32, 62. So, in *Latif*, the Court recognized that "the limited nature of the public disclosure in this case mitigates Plaintiffs' claims of injury to their reputations," but clarified that only mitigated the harm, and in sum, "the injury to Plaintiffs' reputations is sufficient to implicate Plaintiffs' constitutionally-protected interests in their reputations." 28 F. Supp. 3d at 1151.

The Government (at 24) points to the Fourth Circuit's decision in *Elhady*. But in *Elhady*, the Court did not, in fact, find a lack of dissemination. Instead, *Elhady*—which involved the broader watchlist and was wrongly decided in any event—relied on the lack of mandatory

consequences from watchlist placement in rejecting appellees' stigma-plus claim. *Elhady v. Kable*, 993 F.3d 208, 222 (4th Cir. 2021). As far as dissemination, the Court did not hold that there was no public dissemination to the public at large, but only held (again, wrongly) that at the summary judgment stage appellees had not "met [their] burden" of showing that the third parties who were "likely to inspect" the information made available to them. *Id*. at 226.

Here, at this stage, there is no record. And even if there were, of course airlines (at a minimum) are "likely to inspect" Khalid's No-Fly List status, because the Government requires them to, in order to deny him boarding on any aircraft. *See* AC ¶ 84. Meanwhile, Khalid's inability to fly creates exactly the stigmatizing change in status that the stigma-plus test was designed to protect. *Humphries*, 554 F.3d at 1186.

The Government (at 24) also relies on the District of Oregon's decision in *Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1275 (D. Or. 2014). *Tarhuni*, in turn relies on *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010), which does require as part of its test dissemination to the community at large. The problem, though, is that, as *Palka's* reliance on *Townsend v. Vallas*, 256 F.3d 661, 669 (7th Cir. 2001) (distinguishing between stigma-plus and reputation-plus), shows, is that *Palka* is a reputation-plus case, not a stigma-plus case. To the extent the court in *Tarhuni* intended to undertake the stigma-plus test of *Paul* as opposed to the reputation-plus test of *Board of Regents v. Roth*, 92 S. Ct. 2701 (1972), it is wrongly decided and contrary to its own Circuit's precedent in *Humphries*.

Finally, the Government briefly argues (at 25) that Khalid does not meet the plus factor. But the Government does not argue that the inability to fly is not a plus factor, or that the

inability to fly is not caused by the disclosure of Khalid's status to airlines.[3] Instead, the Government only argues that because there is no disclosure to the general public, there can be no plus factor associated with a disclosure to the general public. But because the stigma-plus test does not require a disclosure to the general public, the Government's derivative argument falls with its primary argument.

### C. Khalid has properly alleged that the Government provides inadequate process to No Fly List placements

#### 1. The Government's demand this Court decide the adequacy of process is premature.

The Government's argument that DHS TRIP is all the process that is constitutionally required (at 25-29) tries to inject a factual conclusion into a Motion to Dismiss. It relies on conclusions based on two cases involving summary judgment on fully-developed records. In one of the two cases, the Government lost on this issue, *Mohamed v. Holder,* 2015 WL 4394958, at *2 (E.D. Va. July 16, 2015). In the other, *Latif v. Lynch*, the Court found that while the revised DHS TRIP facially satisfied "in principle most of the procedural due-process requirements that the Court set out in its June 2014 Opinion," the record in that case was "not sufficient to resolve whether such procedures were, in fact, constitutionally sufficient." 10-cv-00750, 2016 WL 1239925, at *2 (D. Or. Mar. 28, 2016). Here, of course, there is no record yet. Instead, as the Courts in *Elhady* and *Mohamed* found at the motion to dismiss stage, "the ultimate merits of that claim are tethered to the Mathews factors, which are 'fact-intensive consideration[s],' which 'when considered within the context of [these] allegations,

---

[3] Because the No-Fly List, unlike the watchlist more generally, prohibits Plaintiffs from boarding an airplane in a foreign country that ultimately lands in the United States or enters United States airspace, the No-Fly List requires status-changing dissemination in order to be effective.

necessarily require an evidentiary record beyond that presented to the Court in connection with the defendants' motion to dismiss." *Elhady v. Piehota*, 303 F. Supp.3d 453, 465-66 (E.D. Va. 2017) (quoting *Mohamed 2014*, 995 F.Supp.2d 520 at 538-39).

### 2. The DHS TRIP process provides inadequate notice and opportunity to be heard.

Even were the Court to prematurely dive into the facts at this stage, the inadequacy of the process is clearly established by Khalid's own experiences. Khalid filed his DHS TRIP on July 16, 2019. He obtained no response, and so filed the instant lawsuit in the summer of 2021. The Government asked until January 25, 2022 to respond to the lawsuit, and then—magically—three days before that response was due, Khalid received a response. The only notice as to the reasons Khalid was on that watchlist that the Government provided (and in fact has ever provided), was, in full:

> You are on the U.S. Government's No Fly list because the U.S. Government continues to have concerns about your association with a known terrorist organization. The information you shared during your March 27, 2012, interview with FBI Special Agents regarding your contacts and activities in Pakistan from 2008 to 2012 did not assuage the U.S. Government's concerns. In particular, the U.S. Government has continuing concerns relating to your candor during this interview.

AC ¶ 113. In other words, an association with a supposed known terrorist organization (which, if false, of course Khalid would and does have no clue what the Government is referring to), and a supposed lack of complete candor in an interview from 10 years ago when Khalid was 16.

Khalid did his best to investigate and respond to the Government's claims, but with no useful notice, he had nothing to respond to. AC ¶ 116. The FBI then interviewed him—unannounced, without counsel present, by polygraph, and seizing and searching his phone. *Id*. ¶ 117. Ultimately, Khalid cut off the interview. *Id*. ¶ 130. As a result of the interview,

Khalid performed additional investigations, and—too late---learned rom his brother in law and his sister, that Mr. Khalid's estranged (non-Muslim) mother had met with FBI agents, and spoke with them in an attempt to keep Mr. Khalid's father from having custody over him as a child. *Id.* ¶ 131. They also told him that his estranged mother relayed to FBI agents that her ex-husband likely forged her signature on Mr. Khalid's passport papers, and that she believed her ex-husband was sending Mr. Khalid to training facilities in Pakistan. *Id.* ¶ 132. She believed so because she claimed Mr. Khalid's father had unusual friends. *Id.* In other words, Khalid found out---from independent sources, and too late to defend himself—that the Government was likely relying on tall tales told by a desperate woman trying to come up with reasons to win a bitter custody dispute. *Id.* ¶ 135.

Khalid then gathered information from his family, learning that sometime between 2008 and 2010, Khalid's mother had met with the FBI on several occasions and offered inaccurate and inflammatory information about Mr. Khalid while he was a minor. AC ¶ 133. When counsel investigated the issue, Khalid's mother wrote that at the time she "was pressuring him to stay" for education-related reasons. *Id.* ¶ 136. She also "remember[s] discussing his situation of being pressured and expressed that I wanted him to stay not knowing what he was returning to," though she stated that she does not know "what I may have said or what may have been misinterpreted by the agents that is now the result that Saad is on the No Fly List and is unable to see the birth of his son and be certain of the health of his now pregnant wife and little daughter." *Id.* Khalid's mother further elaborated that she knew nothing of relevance about any of Mr. Khalid's father's friends or associates during the time of the FBI interrogations. *Id.*

23

Because the Government gave Khalid no notice of the claims and evidence against him, Khalid found this all out too late to get it into the record for his DHS TRIP appeal. So, in sum, it appears that Khalid is on the No Fly List because his mother made up stories in a custody dispute over 10 years ago. And the inadequacies in terms of notice and opportunity to be heard with DHS TRIP show how that information failed to get into the record for the Government (much less any court) to consider it.

The Government's argument that DHS TRIP provides adequate process relies on the Ninth Circuit's decision in *Kashem* , 941 F.3d 358. This Court should not rely on *Kashem* for four separate reasons.

First, *Kashem* did not find that the DHS TRIP process provided constitutionally adequate process in all cases, it merely found that, as applied, "the procedures provided to the plaintiffs were constitutionally sufficient in the case before us, or that any error was nonprejudicial." 941 F.3d at 365. The Ninth Circuit reached this conclusion because of the Court's other finding that the *Kashem* plaintiffs belonged on the No Fly List regardless. *Id*. at 368.

Second, *Kashem* was decided on the full record, and this case is at the motion to dismiss stage. *See* § A, above.

Third, to the extent the Court intended to bless the revised DHS TRIP process, *Kashem* was wrongly decided, as the revised DHS TRIP process not only provides inadequate notice but no other relevant hallmarks of due process, such as a hearing, the ability to cross-examine witnesses, the opportunity to review evidence, or anything close to a neutral arbiter. *See generally Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Fourth—related to previous two points— to the extent the Court intended to bless the Government's changes to DHS TRIP going forward, the record in that case was necessarily

inadequate to resolve this case. The Ninth Circuit in *Kashem* may have hoped that those just-announced changes would indeed provide an adequate record to provide meaningful process to individuals on the No Fly List. But because the revised process was created for *Kashem*, there was nothing in the record as to how that process would apply in the future. And any hope the Ninth Circuit had that the revised process would provide adequate notice was ill placed, as Khalid's experience shows. Because of the post-*Kashem* history of the *Kashem* remedy, Khalid will be able to put forth a different record in this case, which will show that the *Kashem* remedy is constitutionally inadequate even under the *Kashem* standard.

After all, Khalid's experience with inadequate notice is hardly unique. Saadiq Long, also represented by Khalid's lawyers, obtained a letter from DHS TRIP providing no more useful notice of the reasons Long was placed on the No Fly List than the one Khalid received. Long's letter stated, in full relevant part:

> You are on the U.S. Government's No Fly List because the U.S. Government has received information that you have participated in training that may make you a threat to U.S. national security. Additionally, your arrest in Gaziantep, Turkey (not far from the Syrian border) in November 2015 is of concern to the U.S. Government.

Joint Appendix, *Long v. Pekoske*, No. 20-1406 (4th Cir.) at 143 (Ex. D). But Long's participation in training was while he was in the United States Air Force (prior to his discharge), at the behest of the United States Government. *Id.* at 59-60. And while Long could explain that arrest and why that arrest did not show he was a terrorist, Long was placed on the No Fly List in 2012, three years before that arrest. Ex. D at 61-66.

Consistently, the Government provides single-paragraph explanations of the charges for which No Fly Listees have to respond, and even then, the charges often make no sense. This is not adequate notice, nor does it provide any meaningful opportunity to be heard.

III.    **The Government violated Khalid's right to substantive due process.**

The right to substantive due process is found in the Fifth and Fourteenth Amendments of the Constitution and serves to protect citizens against government interference with fundamental rights. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

The Supreme Court has interpreted the word "liberty" in those amendments to include rights deeply rooted in US history--fundamental rights—which are "essential components of our Nation's concept of ordered liberty. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022). Substantive rights receive constitutional protection much greater than procedural rights. Indeed, substantive due process protects liberty from government action regardless of the "fairness of procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Therefore, state action which wrongfully deprives a person of life, liberty or property violates substantive due process in every instance unless the deprivation is "narrowly tailored to serve a compelling interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

Here, Khalid's substantive due process claim regards the wrongful deprivation of liberty—his right of movement.

A.    **The freedom of movement is a fundamental right.**

The Government (at 30-31). relies on the "shocks the conscience" doctrine. This misunderstands Khalid's substantive due process claim. Substantive due process protects against more than just conscience-shocking behavior. It also protects fundamental rights. Substantive due process is the Constitution's "most comprehensive protection of liberties." *Rochin v. California*, 342 U.S. 165, 170 (1952). And those protections, as the Government's own brief acknowledges (at 30), include all rights "implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987). The right of movement is among those rights.

### 1.   The DC Circuit has held movement is a fundamental right.

DC Circuit precedent held long ago that "adults have a fundamental right to free movement." *Hutchins by Owens v. D.C.*, 144 F.3d 798, 806 (D.C. Cir. 1999). Even the Government acknowledges how clear the issue is. The "freedom to travel interstate," the Government concedes (at 31), "may be fundamental." (at 31). That concession alone resolves the Government's attempt to dismiss the Substantive Due Process claim.

### 2.   The DC Circuit's precedents are correct.

Starting from first principles changes nothing. *Dobbs* instructs courts dealing with Substantive Due Process claims to look to "what the Fourteenth Amendment means by the term 'liberty." *Dobbs*, 142 S. Ct. at 2248. To answer that question, the Court must be "guided by the history and tradition that map the essential components of our Nation's concept of ordered liberty." *Id.* This inquiry requires "a careful analysis of the history of the right at issue." *Id.* at 2246; *see also Glucksberg*, 521 U.S. at 721 ("Our Nation's history, legal traditions, and practices thus provide the crucial guideposts.").

Our history—both ancient and contemporary—confirms that a right of movement is among the Constitution's unenumerated rights. In 1958, seemingly to answer the question posed by this case now, the Supreme Court described the right of movement—"across frontiers in either direction, and inside frontiers as well"—as a "part of our heritage." *Kent v. Dulles*, 357 U.S. 116, 126 (1958). And "the right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment." *Id.* at 129.

Nor was *Kent* creating a new right. As the DC Circuit itself explained, at least one aspect of the right of movement, what it called a right of interstate travel, was "first recognized in *Crandall v. State of Nevada*"—a Supreme Court decision more than 150 years old. *State of*

27

*Kan. v. United States*, 16 F.3d 436, 441 (D.C. Cir. 1994) (citing *Crandall v. State of Nevada*, 73 U.S. 35 (1867).

Just after the Civil War's end, *Crandall* explained why the right of movement was central to our Constitution: "[The citizen] has the right to come to the seat of government…or to transact any business he may have with it…to seek its protection, to share its offices, to engage in administering its functions. [H]e has a right to free access to its sea-ports." *Id.* at 44.  A violation of the right of movement, then, also interfered with all of these other rights, just as the No Fly List's flight ban does today to Khalid.

Courts have described the right of movement in various ways, leading the DC Circuit to observe that the constitutional right to "freedom of movement…[is] sometimes called the right to travel." *United States v. Matthews*, 419 F.2d 1177, 1193 (D.C. Cir. 1969). But the terminology is much more varied that just that. In 1900, the Supreme Court described Mr. Khalid's substantive due process right as the "right of locomotion" and the "right to remove from one place to another according to inclination." *Williams v. Fears*, 179 U.S. 270, 274 (1900). Four years later, the Supreme Court explained that "free movement" was among the "fundamental rights of citizens," offering Khalid protections for movement "out of, into, and settlement within, the confines of any state, district, or territory." *Pope v. Williams*, 193 U.S. 621, 624 (1904). Throughout the 20th century, the Supreme Court continued to churn out various ways of describing the right of movement and its necessary ingredients:

- a "freedom of movement" that includes travel "both internally and abroad," *Aptheker v. Sec'y of State*, 378 U.S. 500, 519 (1964) (Black, concurring);

- the right to travel "throughout the length and breadth of our land" *Shapiro v. Thompson*, 394 U.S. 618 (1969);

- the "right of interstate travel" and the "right of international travel" *Haig v. Agee*, 453 U.S. 280, 307 (1981);

28

- the "freedom to travel abroad" *Califano v. Aznavorian*, 439 U.S. 170, 175 (1978)

Among the circuit courts, the nomenclature describing the right of movement has become even more fragmented:

- the "right of intrastate travel," which the Second Circuit deduced as a "correlative constitutional right to travel within a state." *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971)

- the "right of localized intrastate movement." *Lutz v. City of York, Pa.*, 899 F.2d 255, 262 (3d Cir. 1990)

- the "right to travel locally through public spaces and roadways," including "free ingress to and egress from" various parts of a state. *Doe v. Miller*, 405 F.3d 700, 713 (8th Cir. 2005)

- the "right to freedom of movement," which includes a "right to localized travel" as well as "interstate and international travel components." *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002)

- "the right of a citizen to re-enter the United States after lawfully traveling abroad is fundamental") *Hernandez v. Cremer*, 913 F.2d 230, 238 (5th Cir. 1990)

- Describing the international travel from abroad to the United States as a citizen's "fundamental right to have free ingress" to his country. *Worthy v. US*, 328 F.2d 386, 394 (5th Cir. 1964).]

This movement-inclusive approach to identifying the contours of Khalid's substantive due process rights neither anticipates nor insulates something like the No Fly List--which excludes traveling citizens from the "usual and available means [of movement] in a modern society." *Mohamed 2015*, 2015 WL 4394958, at *6. The No Fly List's novel deprivation and the unspeakable ordeal it inflicts on Khalid and his young family combine to illuminate an ancient aspect of the right of movement—the freedom to depart from and return to one's country—that is neither fully international nor fully interstate. *See Mohamed* 2017, 266 F.Supp.3d at 878 ("interstate and international travel are increasingly seamless and we can no longer

reasonably view interstate and international travel as discrete and separable activities."). Indeed, the Magna Carta,[4] the Articles of Confederation,[5] the Universal Declaration on Human Rights,[6] and the International Covenant on Civil and Political Rights[7] all prove that Khalid's freedom to travel to Pakistan to see his pregnant wife and his toddler-aged child is a central feature of "our Nation's concept of ordered liberty." *Dobbs*, 142 S. Ct. at 2248.

### B.   The No Fly List interferes with Khalid's substantive rights, no matter how this Court decides to label them.

Khalid's Substantive Due Process claim survives even if this Court splices Khalid's right of movement into separate rights regarding interstate and international travel. The right of domestic interstate travel is "virtually unqualified." *Haig*, 453 U.S. at 307 (citing *United States v. Guest*, 383 U.S. 745, 757-58 (1966)). As one Court assessing the No Fly List's impact on interstate travel put it, "The effect of the No Fly List on the fundamental right of interstate travel is at least as great as other effects on fundamental rights found to constitute significant interference." *Mohamed*, 266 F. Supp. 3d at 879–80.

The right of international travel, admittedly, has been subject to "reasonable government regulation" as circumstances have warranted. *Haig*, 453 U.S at 306-07. But the No Fly

---

[4] "All merchants may enter or leave England unharmed and without fear, and may stay or travel within it, by land or water, for purposes of trade, free from all illegal exactions, in accordance with ancient and lawful customs." Art. 41.

[5] "[T]he people of each state shall have free ingress and regress to and from any other state." Art. IV.

[6] "Everyone has the right to freedom of movement and residence within the borders of each state" and "[e]veryone has the right to leave any country, including his own, and to return to his country." Art. 13.

[7] "Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence," "[e]veryone shall be free to leave any country, including his own, and "[n]o one shall be arbitrarily deprived of the right to enter his own country." Art. 12.

List infringes on that right nevertheless. *Latif*, 28 F. Supp. 3d at 1149 (finding right implicated "even though [listees] may not have been completely banned from traveling"); *see also El Ali v. Barr*, 473 F. Supp. 3d 479, 508 (D. Md. 2020) (that "less convenient means of transportation" remain technically available "does not change the analysis when considering, in many instances, the tremendous effort and time required to take such an alternative option.").

This Court need not decide the precise contours of Khalid's right of movement—or if the Court alternatively finds, his separate rights to international and interstate travel—at the motion to dismiss stage. "It is best to draw the constitutional line after we know the actual facts rather than to indulge in a long list of abstract opinions now." *Ibrahim v. Dep't of Homeland Sec.*, No. C 06-00545 WHA, 2012 WL 6652362, at *8 (N.D. Cal. Dec. 20, 2012). At this stage, it is enough for the Court to find that Khalid's status on the No Fly List infringes on substantive due process rights Khalid has to travel—domestically and internationally.

### C.   The No Fly List is not narrowly tailored.

Because the Government's decision to place Khalid on the No Fly List interferes with his substantive due process right of movement it must "withstand strict scrutiny." *El Ali*, 473 F. Supp. 3d at 514. Strict scrutiny requires the Government to cease its interference with fundamental rights "unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721; *See also Mohamed*, 266 F. Supp. 3d at 879 (applying strict scrutiny to the No Fly List because it "significantly interferes with [a listee's] fundamental right to interstate travel…even though it only "limits their practical ability" to travel and "does not prevent designees from traveling domestically" completely). At the motion to dismiss stage, Khalid limits his strict scrutiny argument to how poorly tailored the No Fly List is—as applied to him as well as facially.

31

And the No Fly List's flight ban is not narrowly tailored. The premise of the No Fly List is that certain people are too dangerous to fly. But that premise is betrayed by the Government's "one-time waiver" process.

Khalid just traveled by air with the Government's permission. *See* AC ¶ 117 (Khalid back in the United States). The Government's own Motion (at 12 n.6) suggests that its one-time procedures "enable U.S. citizens or lawful permanent residents on the No Fly List to return to the United States from abroad, subject to certain requirement." The Government's declaration—putting aside the lack of any rationale why this Court should be accepting declarations in response to a Motion to Dismiss—confirms. Dkt. 19-1 at ¶ 8. But if the Government can make these exceptions in unique circumstances, it can make them elsewhere.   The Government proves that its flight ban is too broad each time it allows people on the No Fly List to fly. *See, e.g., Tandon v. Newsom,* 141 S. Ct. 1294, 1298 (2021) (existence of exceptions shows lack of narrow tailoring).

The Government nevertheless argues (at 36) that the No Fly List is "the least restrictive means for furthering the Government's compelling interest." The Government goes on to claim that because flying is special, the No Fly List is narrowly tailored. But there is no explanation why the Government cannot use exceptions like the one-time waiver to allow individuals to fly more often. Nor is there any proof at this stage that individuals like Khalid on the No Fly List pose such a threat to aviation security that they should be forbidden from flying outright—or indeed, that they pose any threat to aviation security at all. *See also El Ali*, 473 F. Supp. 3d at 514 (The allegations "that the No Fly List, as an outgrowth of the TSDB, is both under and overinclusive and so has been wholly ineffectual in furthering the

government's legitimate security interests" are "plausible," making the narrow tailoring question "fact-dependent" and thus "inappropriate" to resolve at the Motion to Dismiss stage).

## IV.   The Government's No Fly List and watchlisting actions violate the APA.

Khalid's APA claim has three components. First, Khalid alleges that the watchlist (including the No Fly List) and the Government's processes for placement are both unconstitutional (for the reasons explained in Sections II-III above) and also "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law." AC ¶ 172. Second, Khalid argues that the DHS TRIP process is unconstitutional (for the reasons explained in Section II above) as well as arbitrary and capricious, an abuse of discretion, and "not in accordance with law." AC ¶ 173. Finally, Khalid argues that even if the No Fly List system was otherwise legal under the APA, the specific decision to place him on the No Fly List was arbitrary and capricious and not in accordance with the Government's own laws related to the No Fly List. AC ¶ 174.[8]

Each of these APA arguments survive a motion to dismiss.

### A.   The Screening Center's creation and maintenance of the No Fly List and watchlist violates the APA.

#### 1.   The No Fly List and watchlist are contrary to constitutional right.

The No Fly List and watchlist violate the Constitution for the reasons stated above. *See also* 5 U.S.C. § 706(B) ("contrary to constitutional right, power, privilege, or immunity").

#### 2.   The watchlist has not been directly authorized by Congress and lacks any meaningful Congressionally-delegated standards

Congress has never directly authorized the No Fly List. *See* 5 U.S.C. § 706(C) ("in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). Nor has Congress even authorized the creation of the Screening Center. Congress has only assumed

---

[8] Notably, this third claim does not challenge the TSA Administrator's rubber-stamping of the TSA Administrator's decision not to remove Khalid from the No Fly List.

these lists and the Screening Center existed. *See. e.g.,* 49 U.S.C. § 44903(j)(E)(3). But background assumptions are no basis for an exercise of authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (executive "power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself"). It is not enough for Congress to assume that the executive is using a No Fly List to prevent individuals from flying exist; Congress must direct the executive to create it, and provide contours for how it is to be implemented. *Id.* at 587 ("the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute"). At minimum, the No Fly List should be limited to those Congress directly authorized to be placed on the watchlist, such as former Guantanamo Bay detainees. 49 U.S.C. § 44903(j)(2)(C)(v) ("The Administrator, in coordination with the Terrorist Screening Center, shall include on the No Fly List any individual who was a detainee held at the Naval Station, Guantanamo Bay, Cuba, unless the President certifies in writing to Congress that the detainee poses no threat to the United States, its citizens, or its allies").

In any event, it is premature at the motion to dismiss stage to require pleading as to the exact contours of statutory authority. *Washington All. of Tech. Workers v. DHS*, 892 F.3d 332, 343 (D.C. Cir. 2018) ("A claim that a regulation exceeds statutory authority is not a claim that requires factual allegations about the defendant's actions in order to demonstrate lack of authority.").

Further, assuming that the No Fly List is Congressionally authorized in the first place, the only standard for placement that can be discerned from any Congressional act (other than, e.g., for former Guantanamo Bay detainees), is that those on the list present a threat to aviation security. However, that standard is not sufficiently detailed to be a proper delegation of

Congressional authority. *See A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495, 530 (1935) (Congress must "itself establish[] the standards of legal obligation, thus performing its essential legislative function," and cannot "transfer that function to others"); *Mistretta v. U.S.*, 488 U.S. 361, 372 (1989) (Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform") (cleaned up). Likewise, Congress has not properly, with enough detail, delegated to the Screening Center or other agencies what consequences the Executive may impose based on watchlist and No Fly List placement.[9]

### 3.    No Fly List and watchlist placement standards are arbitrary and capricious.

Even assuming that the No Fly List is Congressionally authorized in the first place, and that Congress has provided sufficiently defined standards for both placement and consequences, the No Fly List still violates the law because the standards used by the Screening Center are arbitrary and capricious. *See* 5 U.S.C. § 706(A) ("arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). The standards for inclusion for both the No Fly List and the broader watchlist allow for consideration of "race, ethnicity, or religious affiliation" as well as their "beliefs and activities protected by the First Amendment, such as freedom of speech, free exercise of religion, freedom of the press, freedom of peaceful assembly, and the freedom to petition the government for redress of grievances." AC ¶ 40.

---

[9] It may seem that, at least for No Fly List placement, the consequence is self-evident from the name, but the contours of what it means to "No[t] Fly" remains ambiguous. Absent theExecutive's own determinations and regulations, for example, there is no Congressional authority for whether a No Fly List listee may board a plane in a foreign country destined for the United States, or may board a plane on a foreign country on a plane that merely crosses United States airspace. Nor does it provide any guidance as to when exceptions (such as the "one-time waiver" should be made for people on the list.

These are "inherently arbitrary" factors for making aviation security determinations. *See Shqeirat v. U.S. Airways, Inc.*, 515 F.Supp.2d 984, 1004 (D. Minn. 2007) (race); *Al-Watan v. Am. Airlines, Inc.*, 658 F. Supp. 2d 816, 825 (E.D. Mich. 2009) (same); *see also Citizens for Legis. Choice v.* Miller, 144 F.3d 916, 922 (6th Cir. 1998) (describing race, religion, and gender as "inherently arbitrary" factors in lawmaking). Likewise, the Screening Center's rubber-stamp procedures for accepting nominations—which have included accepting nominations based on the nominator's desire to coerce listees into acting as informants, among other things, AC ¶ 59—has led to a "grave risk of erroneous deprivation." *Elhady v. Kable*, 391 F. Supp. at 581. And for the broader watchlist, placement does not even depend on being reasonably suspected of any criminal activity or being any threat to aviation security. Instead, a person can be placed on the TSDB for being reasonably suspected of non-criminal activity, AC ¶ 42, including simply being related to someone the government believes is a terrorist, AC ¶ 47.

At this point, there is no administrative record before the Court. As a result, the Court cannot adequately adjudicate whether the Screening Center's administration of the No Fly List is arbitrary and capricious. *Swedish Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 88 (D.D.C. 2010). For this reason alone, dismissal of Khalid's APA claim is unwarranted. *Id.*

## B.   The DHS TRIP Process is arbitrary and capricious.

For the reasons explained above in Section II(C)(2), the DHS TRIP process is arbitrary and capricious. *See* 5 U.S.C. § 706(A). This Court has jurisdiction to resolve this claim because, as explained above in Section I(A), because Congress instructed the DHS Secretary, not the TSA Administrator, to develop the DHS TRIP process in, 49 U.S.C. § 44926(a), and so even if Section 46110 creates exclusive jurisdiction in the Court of Appeals, it only does so "with respect to security duties and powers designated to be carried out by the Administrator

of the Transportation Security Administration." Under the APA, the DHS TRIP process is arbitrary and capricious due to the lack of adequate process it provides, *see* § II(C), above, even if there is no constitutional right to due process in the first instance.

Again, without a record of the DHS TRIP process, including how it was developed and why basic limitations placed in the process such as lack of predeprivation notice, any notice at all for those on the broader watchlist, disclosure of the reasons and evidence supporting placement on the No Fly List or watchlist, the lack of a hearing, and the lack of a neutral arbiter, the Court cannot at this point rule on Khalid's APA claim. *Swedish American Hospital*, 691 F. Supp. 2d at 88. The Court should thus deny the Motion to Dismiss as to this claim.

### C.    Khalid's own placement was arbitrary and capricious

The Amended Complaint further alleges that Khalid's own placement was arbitrary and capricious, and not in accordance with the Screening Center's own (illegal) standards and procedures. AC ¶ 172; *see also* 5 U.S.C. § 706(A). Khalid is not a terrorist, and there is no appropriate, current evidence that Khalid is a threat to aviation security or is a threat to commit any other form of terrorist act. *See* AC ¶ 45. Instead, the record—once produced—will likely show that the Government is relying on inherently unreliable statements made by Khalid's estranged mother that were (a) made during a custody dispute more than 10 years ago, when Khalid was a child, in order to gain custody over Khalid, and (b) have been since disclaimed by Khalid's mother in any event.

Again, the record is currently not before the Court. Without a record, dismissal at this stage is inappropriate. *Swedish American Hospital*, 691 F. Supp. 2d at 88.

V.      **Khalid states a valid RFRA claim.**

   A.      **Plaintiff has standing to bring his RFRA claim.**

Plaintiff seeks the ability to engage in hajj. Hajj is a pilgrimage to Mecca in Saudi Arabia all Muslims are instructed, as one of Islam's five pillars, to perform at least once in their lifetime. Mustafa Khattab, *The Clear Quran* (an English translation of the Quran), Chapter 3, Verse 97. The rites of pilgrimage are performed over several days during the last month of the Islamic calendar.

But Khalid cannot go to Hajj, because he cannot fly out of the United States. While the Government may suggest that he has the potential ability to fly from Canada or Mexico, that is a mere possibility. Most, if not all, flights from Canada and Mexico to Saudi Arabia, cross United States airspace, and even if they do not, the Government's transmission of Khalid's No Fly status to other countries either prevents him completely or makes substantially more difficult and dangerous international travel out of Mexico, Canada, or any other country. And even if Khalid overcomes all that, it is unclear whether Saudi Arabia—itself a recipient of watchlist information—would deny entry to Khalid (or worse, detain and torture Khalid) based on the information the Government transmits. And in any event, being forced to do all of that is on its face a substantial burden, which is why Americans in the United States who want to fly to places across the ocean do not generally take the bus to Mexico City or Toronto first.

The Government suggests that (at 35-36), in order to have standing for this claim, Khalid must provide dates, itineraries, perhaps book a flight, and actually show the fact that being on a No Fly List is a burden to someone who would like to go from the United States to Saudi Arabia. Similar standing arguments have been made in watchlist and other cases by

38

the Court before and have been uniformly rejected. *See, e.g., Alasaad v. Nielsen*, 2018 WL 2170323, at \*10 (D. Mass. May 9, 2018) ("Plaintiffs' allegations of future harm are no less concrete because they omit specific plans or dates of future travel."); *Wilwal v. Nielsen,* 346 F. Supp. 3d 1290, 1302 (D. Minn. 2018) ("Courts do not require plaintiffs to engage in international travel when they have experienced difficulties at the border and reasonably expect the same difficulties when returning to the United States from future travel.") (stringcite omitted); *Elhady 2019*, 391 F. Supp. 3d at 575; *Mohamed 2017*, 266 F.Supp.3d at 875 ("Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing."). In any event, Khalid cannot reasonably actually prepare his hajj trip—which again must be performed during a short window that is open only once a year—while the specter of No Fly List placement remains over him. Otherwise, he will be forced to purchase expensive tickets for flights the Government has already told him he is unable to board, all while risking extraordinary harm at the Saudi Arabian border even if the Government did allow him on a plane.

Khalid has not only thus alleged standing but also a substantial burden on a sincere religious belief. *See El Ali v. Barr*, 18-cv-2415, 2020 WL 4051866, at \*\*30 (D. Md. July 20, 2020) (finding allegations that watchlist placement, even without No Fly List placement, burdens plaintiffs' sincere religious beliefs in performing hajj was sufficient to survive motion to dismiss).

The Government's argument that Khalid doesn't have a substantial burden because maybe he can take a flight from Canada or Mexico (or maybe not) and maybe the Saudi government will permit him entry into the United States without torturing him despite the Government transmitting Khalid's watchlist information to the Saudis depends on two cases,

neither of which stand for anything near such a proposition. *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001), states that an individual's sincere religious belief in spreading the gospel by any means is not substantially burdened by the Government taking away one of those means, i.e., selling tee shirts, in one specific location, i.e., the National Mall. *Mahoney v. Doe*, 642 F.3d 1112, 1120 (D.C. Cir. 2011), held the same as to a similar sincere religious belief, when the Government outlawed using chalk on 1600 Pennsylvania block. These extremely narrow cases are different than the case here, where the Government eliminates the only reasonable and normal way for Khalid to perform hajj, a particular sincere religious belief. *See generally Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 295-96 (D.D.C. 2020) (explaining the limited holding of both cases and noting plaintiffs in those cases "did not establish a belief specific to the activity that the challenged regulations would burden" their sincere religion beliefs). Khalid does not merely want to pray in as many places or as in many different ways as he can. He wants to perform Hajj, one of the five pillars of Islam, by going to Mecca, which is across the ocean in the Middle East.

Also like in *El Ali*, the Government argues that Khalid's Motion to Dismiss should be denied because the No Fly List and watchlist are the least restrictive means for enforcing a compelling government interest. This seems unlikely, because the Government has already shown that it can allow people on the No Fly List to fly, but for whatever reason, restricts such allowances to flights from overseas to the United States to single use. *See Latif*, 28 F. Supp. 3d at 1143. In any event, here, like in *El Ali*, this argument is premature. *El Ali*, 2020 WL 4051866 at *28.

As the Supreme Court has explained, RFRA places an "exceptionally demanding" on burden the government to show that it "lacks other means of achieving its desired goal

without imposing a substantial burden on the exercise of religion by the objecting parties." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). And the Government must not do so in some general fashion but must show "that the compelling interest test is satisfied through application of the challenged law to ... the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 726. Because the Court must decide the Motion to Dismiss on the pleadings alone, the Government cannot show that the No Fly List or the broader watchlist are necessary for a compelling government interest, or that they are the least restrictive means for furthering such an interest. *See Sabir v. Williams*, 37 F.4th 810, 821 (2d Cir. 2022). Only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint" may that defense "be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); see *also Hillmon v. Alameida*, 2005 WL 2030571, at *5 (E.D. Cal. Aug. 22, 2005) (motion to dismiss not appropriate vehicle for determining least restrictive means), *report and recommendation adopted*, 2005 WL 2452537 (Sept. 28, 2005); *Howe v. Burwell*, 2015 WL 4479757, at *15 (D. Vt. July 21, 2015) (holding that the plaintiff stated a plausible RFRA claim to survive a motion to dismiss by alleging a substantial burden; noting, "Plaintiff need not disprove the Federal Defendants' claims with regard to which they bear the burden of proof.").

The Government puts forth not a single case for the proposition that assertions of national security are sufficient for the Government to meet its heavy burden under RFRA. The Court should deny the Government's Motion to Dismiss on this claim and all others.

## CONCLUSION

The Court should deny the Government's Motion to Dismiss.

Respectfully Submitted,

CAIR LEGAL DEFENSE FUND

BY:     **/s/ Lena F. Masri**
LENA F. MASRI (DC 100019)
GADEIR I. ABBAS (VA 81161) β
JUSTIN SADOWSKY (DC 977642)
ZANAH GHALAWANJI (MI P 83116) ç
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420
Fax: (202) 379-3317
Email: LDF@CAIR.COM

*Attorneys for Plaintiff*

*β Licensed in VA, not in DC. Practice limited to federal matters.*

*ç Licensed in MI, not in DC. Practice limited to federal matters.*

Dated: August 12, 2022