## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SAAD BIN KHALID**, | **Case No. 1:21-cv-02307-CRC** |
| *Plaintiff,* | |
| v. | **Hon. Judge Christopher R. Cooper** |
| **MERRICK GARLAND**, et al | |
| *Defendants.* | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1

## INTRODUCTION

Saad bin Khalid moves this Court to order the Government to allow him on a flight—any flight—from Pakistan to the United States arriving before October 10th. The stakes, for Saad's career and his family (a wife, a toddler, and an infant not two months old) hang in the balance. If this Court does not intervene and the Government continues to obstruct Mr. Khalid's travel until his paternity leave expires on October 10th, Mr. Khalid will lose his job

This dispute comes as a surprise. The Government gave Mr. Khalid permission months ago to do exactly what this motion seeks here: come home. In January, the Government agreed to allow Mr. Khalid to take two flights his No Fly List status was supposed to preclude—one flight from London to New York City and another flight from New York City to Cinncinati. For reasons unknown, what the Government permitted in March they seek to prevent in October.

This the Constitution forbids. Substantive due process confers upon all citizens a right of movement that puts real limits on the Government's authority to banish people from entire categories of transportation. Though Defendants complain about "facilitating [Mr. Khalid's] travel a second time," the Government's decision to give Mr. Khalid permission to fly in March and avoid emergency briefing then reflects the clarity of this right and the obvious less restrictive alternatives to the No Fly List's usually-but-not-in-March flight ban. The Court should compel the Government to allow Mr. Khalid to board an October flight—any flight the Government chooses—arriving in the United States before October 10th.

## FACTUAL BACKGROUND

Like many people on the No Fly List, Mr. Khalid has sought and received permission from the Government to fly through US airspace. Gadeir Aff. Some have received such

permissions on multiple occasions. Gadeir Aff. On January 25, 2022, at the direction of lawyers for the Department of Justice, Plaintiff's counsel emailed the US Embassy in Islamabad, requesting that officials approve one of three itineraries Mr. Khalid proposed booking. *See* Exhibit A (Consular emails),

Plaintiff's counsel was perplexed as to why the Department of Justice directed us to write the embassy, because as officials there quickly pointed out, the Consulate "does not determine whether the itinerary is acceptable." Ex. A. Indeed, Consulate officials explained that they were "awaiting word from relevant federal offices about the itineraries [Mr. Khalid] provided" and, when they finally got that word, emailed Plaintiff's counsel to inform them that "the March 7 Jetblue itinerary…has been approved by relevant federal offices" outside the Department of State. *Id.* Subject to special screening and whatever security procedures the Government decided upon, Mr. Khalid flew from London to New York City and then again from New York City to Cincinnati with the Government's permission. Abbas Dec. (Ex. B) at ¶ 13.

This supplication—fueled by a begger's hope that it reaches the official secretly deciding whether to give or deny permission to board a flight--is no process at all. As the embassy explained in response to Plaintiff's counsel, there is "no paperwork" that allows people to make an official request "nor do[es] [the Embassy] typically receive paperwork in such situations." Ex. A.

Nevertheless, having succeeded in getting permission to fly from Pakistan to the United States earlier this year, Mr. Khalid's attorneys more recently made the opposite request: permission for Mr. Khalid to travel to Pakistan for the birth of his son, who was due to be born in mid-August. Exhibit C (Email chain between counsel and Government.) The

Government denied Mr. Khalid's request due to his placement on the No Fly List. *Id.* That denial lacked any reasonable basis, especially because Mr. Khalid had previously been allowed to board U.S. air carrier for travel to the United States six months ago. *See* Khalid Declaration (Exhibit D) at ¶¶ 5-6.

Mr. Khalid, fearful that a motion for a temporary restraining order or preliminary injunction would not be litigated in time for him to be present for the birth of his son, took a 30-hour bus ride from Cleveland, Ohio to Monterrey, Mexico. *Id.* at ¶ 9. After spending the night in Monterrey, he flew on to Cancun. *Id.* After arriving in Cancun (spending the night again), Mr. Khalid attempted to board a flight on Turkish Airlines to Pakistan, connecting in Istanbul. *Id.* at ¶¶ 10-11. But he was denied boarding because the flight happened to cross near United States airspace. *Id.* at ¶ 11. So, determined to get home to see his wife and soon-to-be-son, Khalid borrowed $3,000 from his brother and bought a flight to Sao Paolo, Brazil, connecting in Panama City, Panama. *Id.* at ¶ 12. The next day, he was able to book yet another flight, this time from Sao Paolo to Pakistan, with a 24-hour layover in Istanbul. *Id.* at ¶¶ 13-15. He finally arrived in Karachi seven days after he left Cincinnati, making it home just in time for the birth of his son. *Id.* at ¶ 17. During those seven days, he lacked communication with his wife, did not know the status of his about-to-be-born son, and subsided on airport food and Mike and Ikes. *Id.*

Once in Pakistan, Khalid (through his counsel in this case) asked if the Government would facilitate his return in time for the end of his paternity leave. Exhibit E. This time, in an extensive letter, the Government pointedly refused. *Id.*

Mr. Khalid's attempts to remedy his situation through the DHS TRIP process have likewise proven unsuccessful. While DHS confirmed what Mr. Khalid already knew, that he

is on the No Fly List, they have not provided sufficient factual information such that Mr. Khalid can appeal the placement. The only information Mr. Khalid received about his placement was summarized in a brief letter from DHS:

> You are on the U.S. Government's No Fly list because the U.S. Government continues to have concerns about your association with a known terrorist organization. The information you shared during your March 27, 2012, interview with FBI Special Agents regarding your contacts and activities in Pakistan from 2008 to 2012 did not assuage the U.S. Government's concerns. In particular, the U.S. Government has continuing concerns relating to your candor during this interview…Additional reasons for and details regarding your placement on the U.S. Governments' No Fly List cannot be provided to you due to law enforcement and national security concerns.

Exhibit F.

Mr. Khalid's DHS TRIP appeals have been unsuccessful and he remains on Defendants' No Fly List, unable to travel freely.

Still, Khalid must return to the United States. He has a job in the United States. His paternity leave ends, at the absolute latest, on October 10. Khalid Dec., Ex. D, at ¶ 22. If he does not return by October 13, he will lose his job. *Id.* at ¶ 23.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, (4) that the grant of an injunction will not disserve the public interest." *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008); *Munaf v. Geren,* 553 U.S. 674, 689-90 (2008); *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 311-12 (1982). In each case, courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences. *Romero-Barcelo*, 456 U.S. at 312.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *United States v. Edward & Sons,* 384 F.3d 258, 261 (6ᵗʰ Cir. 2004) ("The purpose of a preliminary injunction is simply to preserve the status quo."). The movant need not prove his case in full at the preliminary injunction hearing, and the findings of fact and conclusions of law made at this stage are not binding at trial on the merits. *Camenisch*, 451 U.S. at 395.

I.   **Plaintiff is likely to succeed on the merits that his placement on the No Fly List violates his substantive due process rights.**

The right to substantive due process is found in the Fifth and Fourteenth Amendments of the Constitution and serves to protect citizens against government interference with fundamental rights. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

The Supreme Court has interpreted the word "liberty" in those amendments to include rights deeply rooted in US history—fundamental rights—which are "essential components of our Nation's concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022). Substantive rights receive constitutional protection much greater than procedural rights. Indeed, substantive due process protects liberty from government action regardless of the "fairness of procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Therefore, state action which wrongfully deprives a person of life, liberty or property violates substantive due process in every instance unless the deprivation is "narrowly tailored to serve a compelling interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

Here, Khalid's substantive due process claim regards the wrongful deprivation of liberty—his right of movement.

**A. As the D.C. Circuit has held, the freedom of movement is a fundamental right.**

Substantive due process is the Constitution's "most comprehensive protection of

liberties." *Rochin v. California*, 342 U.S. 165, 170 (1952). Those protections, as the Government's own brief acknowledges (at 30), include all rights "implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987). For decades, the D.C. Circuit has properly recognized that the right of movement is among those rights, as "adults have a fundamental right to free movement." *Hutchins by Owens v. D.C.*, 144 F.3d 798, 806 (D.C. Cir. 1999). Even the Government acknowledged in its Motion to Dismiss (Dkt. 19), how clear the issue is. The "freedom to travel interstate," the Government concedes (at 31), "may be fundamental." (at 31). That concession alone resolves the Government's attempt to dismiss the substantive due process claim.

Starting from first principles changes nothing. *Dobbs* instructs courts dealing with substantive due process claims to look to "what the Fourteenth Amendment means by the term 'liberty." *Dobbs*, 142 S. Ct. at 2248. To answer that question, the court must be "guided by the history and tradition that map the essential components of our Nation's concept of ordered liberty." *Id.* This inquiry requires "a careful analysis of the history of the right at issue." *Id.* at 2246; *see also Glucksberg*, 521 U.S. at 721 ("Our Nation's history, legal traditions, and practices thus provide the crucial guideposts.").

Our history—both ancient and contemporary—confirms that a right of movement is among the Constitution's unenumerated rights. In 1958, seemingly to answer the question posed by this case today, the Supreme Court described the right of movement— "across frontiers in either direction, and inside frontiers as well"—as a "part of our heritage." *Kent v. Dulles*, 357 U.S. 116, 126 (1958). And "the right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment." *Id.* at 129.

Nor was *Kent* creating a new right. As the DC Circuit itself explained, at least one

aspect of the right of movement, what it called a right of interstate travel, was "first recognized in *Crandall v. State of Nevada*"—a Supreme Court decision more than 150 years old. *Kansas v. United States*, 16 F.3d 436, 441 (D.C. Cir. 1994) (citing *Crandall v. State of Nevada*, 73 U.S. 35 (1867).

Just after the Civil War's end, *Crandall* explained why the right of movement was central to our Constitution: "[The citizen] has the right to come to the seat of government…or to transact any business he may have with it…to seek its protection, to share its offices, to engage in administering its functions. [H]e has a right to free access to its sea-ports." *Id.* at 44. A violation of the right of movement, then, also interfered with all of these other rights, just as the No Fly List's flight ban does today to Khalid.

Courts have described the right of movement in various ways, leading the DC Circuit to observe that the constitutional right to "freedom of movement…[is] sometimes called the right to travel." *United States v. Matthews*, 419 F.2d 1177, 1193 (D.C. Cir. 1969). But the terminology is much more varied that just that. In 1900, the Supreme Court described Mr. Khalid's substantive due process right as the "right of locomotion" and the "right to remove from one place to another according to inclination." *Williams v. Fears*, 179 U.S. 270, 274 (1900). Four years later, the Supreme Court explained that "free movement" was among the "fundamental rights of citizens," offering Khalid protections for movement "out of, into, and settlement within, the confines of any state, district, or territory." *Pope v. Williams*, 193 U.S. 621, 624 (1904). Throughout the 20th century, the Supreme Court continued to churn out various ways of describing the right of movement and its necessary ingredients:

- a "freedom of movement" that includes travel "both internally and abroad," *Aptheker v. Sec'y of State*, 378 U.S. 500, 519 (1964) (Black, J., concurring);
- the right to travel "throughout the length and breadth of our land," *Shapiro v. Thompson*, 394 U.S. 618 (1969);

8

- the "right of interstate travel" and the "right of international travel," Haig v. Agee, 453 U.S. 280, 307 (1981);
- the "freedom to travel abroad," Califano v. Aznavorian, 439 U.S. 170, 175 (1978).

Among the circuit courts, the nomenclature describing the right of movement has become even more fragmented:

- the "right of intrastate travel," which the Second Circuit deduced as a "correlative constitutional right to travel within a state," *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971);
- the "right of localized intrastate movement," *Lutz v. City of York, Pa.*, 899 F.2d 255, 262 (3d Cir. 1990);
- the "right to travel locally through public spaces and roadways," including "free ingress to and egress from" various parts of a state, *Doe v. Miller*, 405 F.3d 700, 713 (8th Cir. 2005);
- the "right to freedom of movement," which includes a "right to localized travel" as well as "interstate and international travel components," *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002);
- "the right of a citizen to re-enter the United States after lawfully traveling abroad is fundamental," *Hernandez v. Cremer*, 913 F.2d 230, 238 (5th Cir. 1990);
- describing the international travel from abroad to the United States as a citizen's "fundamental right to have free ingress" to his country, *Worthy v. US*, 328 F.2d 386, 394 (5th Cir. 1964).

This all-kinds-of-movement approach to defining the contours of Khalid's substantive due process rights leaves no lawful room for something like the No Fly List, which excludes traveling citizens from the "usual and available means [of movement] in a modern society." *Mohamed v. Holder*, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015). The No Fly List's novel deprivation and the unspeakable ordeal it inflicts on Khalid and his young family combine to illuminate an ancient aspect of the right of movement—the freedom to depart from and return to one's country—that is neither fully international nor fully interstate. *See Mohamed v. Holder*, 266 F. Supp. 3d 868, 878 (E.D. Va. 2017) ("[I]nterstate and international travel are increasingly seamless and we can no longer reasonably view interstate and international travel

as discrete and separable activities."). Indeed, the Magna Carta,[1] the Articles of Confederation,[2] the Universal Declaration on Human Rights,[3] and the International Covenant on Civil and Political Rights[4] all prove that Khalid's right to return to his country of citizenship—the United States—is among the more pronounced features of "our Nation's concept of ordered liberty." *Dobbs*, 142 S. Ct. at 2248.

**B.    The No Fly List interferes with Khalid's constitutional rights, no matter how this Court decides to label them.**

Khalid's substantive due process rights have been violated even if this Court splices Khalid's right of movement into separate rights regarding interstate and international travel. The right of domestic interstate travel is "virtually unqualified." *Haig*, 453 U.S. at 307 (citing *United States v. Guest*, 383 U.S. 745, 757-58 (1966)). As one court assessing the No Fly List's impact on interstate travel put it, "The effect of the No Fly List on the fundamental right of interstate travel is at least as great as other effects on fundamental rights found to constitute significant interference." *Mohamed 2017*, 266 F. Supp. 3d at 879-80.

The right of international travel, admittedly, has been subject to "reasonable government regulation" as circumstances have warranted. *Haig*, 453 U.S at 306-07. But the

---

[1] "All merchants may enter or leave England unharmed and without fear, and may stay or travel within it, by land or water, for purposes of trade, free from all illegal exactions, in accordance with ancient and lawful customs." Art. 41.

[2] "[T]he people of each state shall have free ingress and regress to and from any other state." Art. IV.

[3] "Everyone has the right to freedom of movement and residence within the borders of each state" and "[e]veryone has the right to leave any country, including his own, and to return to his country." Art. 13.

[4] "Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence," "[e]veryone shall be free to leave any country, including his own, and "[n]o one shall be arbitrarily deprived of the right to enter his own country." Art. 12.

No Fly List infringes on that right nevertheless. *Latif*, 28 F. Supp. 3d at 1149 (finding right implicated "even though [listees] may not have been completely banned from traveling"); *see also El Ali v. Barr*, 473 F. Supp. 3d 479, 508 (D. Md. 2020) (that "less convenient means of transportation" remain technically available "does not change the analysis when considering, in many instances, the tremendous effort and time required to take such an alternative option").

As far as the domestic right to travel, rather than fly across the country, Khalid can only take busses and trains. This makes simple flights incredibly long. It took 30 hours for Khalid to take a bus across the border to Monterrey, just across the border. Ex. B at ¶ 9. A flight would have been a matter of hours. Cincinnati to Houston is 2 and a half hours flight, nonstop. By car, it is 16 hours. By public transportation (bus or train), at least 24 hours. This constitutes a deprivation of Khalid's right of movement as it relates to domestic travel.

International travel is only worse. As Khalid's own experience, a trip to Karachi that would have been 24-36 hours (with a connection) took seven days. Ex. B, at ¶¶ 20-21. It costs thousands of dollars more than it should. *Id.* And the Government's only response appears to be that the Government does not prohibit Khalid from travelling by plane once outside the United States, so long as Khalid remains completely outside the United State's jurisdiction. But that the United State's deprivation of Khalid's rights extends only as far as the reach of Government control is hardly a defense. And even then, Khalid was unable to travel from Cancun to Karachi (via Istanbul) merely because the flight went close to United States airspace. Ex. B at ¶ 11.

**C.    The No Fly List is not narrowly tailored.**

Because the Government's decision to place Khalid on the No Fly List interferes with

his substantive due process right of movement it must "withstand strict scrutiny." *El Ali*, 473 F. Supp. 3d at 514. Strict scrutiny requires the Government to cease its interference with fundamental rights "unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721; *see also Mohamed 2017*, 266 F. Supp. 3d at 879 (applying strict scrutiny to the No Fly List because it "significantly interferes with [a listee's] fundamental right to interstate travel…even though it only "limits their practical ability" to travel and "does not prevent designees from traveling domestically" completely). At the motion to dismiss stage, Khalid limits his strict scrutiny argument to how poorly tailored the No Fly List is—as applied to him as well as facially.

The No Fly List's flight ban is not narrowly tailored. The premise of the No Fly List is that certain people are too dangerous to fly. But that premise is betrayed each time the Government allows a person on the No Fly List to fly.

Khalid recently traveled by air with the Government's permission. *See* AC ¶ 117 (Khalid back in the United States). The Government's own Motion (at 12 n.6) suggests that its waiver procedures "enable U.S. citizens or lawful permanent residents on the No Fly List to return to the United States from abroad, subject to certain requirements." The Government's declaration—putting aside the lack of any rationale why this Court should be accepting declarations in response to a Motion to Dismiss—confirms. Dkt. 19-1 at ¶ 8. But if the Government can make these exceptions in unique circumstances, it can make them elsewhere. The Government proves that its flight ban is too broad each time it allows people on the No Fly List to fly. *See, e.g., Tandon v. Newsom,* 141 S. Ct. 1294, 1298 (2021) (existence of exceptions shows lack of narrow tailoring).

The Government will likely argue that the No Fly List withstands strict scrutiny

because it is narrowly tailored. But at minimum, and is particularly relevant here, there is no explanation why the Government cannot use exceptions like permission it gave Khalid to fly in March to allow individuals to fly more often. Nor is there any proof that Khalid poses such a threat to aviation security that he should be forbidden from flying outright—or indeed, that he poses any threat to aviation security at all. *See also El Ali*, 473 F. Supp. 3d at 514 (The allegations "that the No Fly List, as an outgrowth of the TSDB, is both under and overinclusive and so has been wholly ineffectual in furthering the government's legitimate security interests" are "plausible.").

## II. The remaining preliminary injunction factors weigh in favor of enjoining enforcement of Plaintiff's placement on the No Fly List.

After demonstrating a likelihood of success on the merits, a party seeking a preliminary injunction must show "(a) a substantial threat of irreparable injury if the injunction is not issued, (b) that the threatened injury if the injunction is denied outweighs any harm that will result of the injunction is granted, and (c) that the grant of an injunction with not disserve the public interest. *Munaf v. Geren,* 553 U.S. 674, 689-90 (2008); *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542 (1987); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311-12 (1982). Because each factor supports Mr. Khalid, an injunction against enforcement of Mr. Khalid's placement on the No Fly List is appropriate.

***Irreparable Harm****.* A party seeking preliminary injunctive relief must show that they imminently will be irreparably harmed by the challenged action or inaction. The "injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Rai v. Biden*, 567 F.Supp.3d 180, 201 (D.D.C., 2021) (citing *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)) (cleaned up). Mr. Khalid has already suffered

irreparable harm and will continue to experience such harm in the absence of preliminary relief. While stranded in Pakistan, Mr. Khalid suffered the irreparable injury of involuntary exile from his country of citizenship in violation of his substantive due process rights. Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore "will often alone constitute irreparable harm." *Monterey Mech. Co. v. Wilson,* 125 F.3d 702, 715 (9th Cir. 1997); *see, e.g., Elrod v. Burns,* 427 U.S. 347, 373-74 (1976) (affirming a grant of preliminary relief and holding that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *LaDuke v. Nelson,* 762 F.2d 1318, 1330 (9th Cir. 1985), *modified on other grounds,* 796 F.2d 309 (9th Cir. 1986) (finding violation of Fourth Amendment rights to cause irreparable harm); *Covino v. Patrissi,* 976 F.2d 73, 77 (2d Cir. 1992) (finding alleged violation of Fourth Amendment rights to demonstrate irreparable harm); *McDonnell v. Hunter,* 746 F.2d 785, 787 (8th Cir. 1984) (affirming a grant of preliminary relief and finding alleged privacy violation to constitute an irreparable harm). Thus, the ongoing ban on travel that Defendants have placed on Mr. Khalid constitutes irreparable injury as a matter of law.

Khalid left the United States to be at the birth of his newborn son. Khalid Dec. (Ex. B) at ¶ 9. To get there, he took a bus from Cleveland to Monterrey, flew on to Cancun, attempted to board a flight in Cancun to Pakistan through Turkey, was denied boarding because the flight incidentally flew over United States airspace, took another flight from Cancun to Panama City and then to Sao Paolo, and then from there flew to Pakistan through Istanbul. Amazingly, he did that seven-day, $4,000-$5,000 journey peacefully.

But he needs to return to the United States now. He has a job here. His paternity leave ends, at the absolute latest, on October 10. *Id.* ¶ 22. If he does not return by October 13, he

will lose his job. *Id.* ¶ 23.

The Government will argue that Khalid will not suffer any harm for two reasons. First, they have callously claimed that Khalid has forfeited any claim to irreparable harm by voluntarily leaving the United States. *See* Exhibit E. The Government's assertion that Khalid should have accepted No Fly List status and remained forever in the United States if he ever wanted to return, not being able to see the birth of his son, flies in the face of their argument that the No Fly List does not impair the right to travel.

Second, the Government will argue that Khalid's ability to eventually make it to Pakistan in the first place shows he can make it back without the Government facilitating his return travel. But look at Khalid's convoluted travel to Pakistan. The trip took seven days and cost $3,000 to $4,000 (each way) more than a single round ticket to Pakistan would have cost in the first instance. Khalid Dec., Ex. B, at ¶¶ 20-21.

Returning the same way would have the same dangers. And this time, if he failed to return in time, he would lose his job. Even without that, he would still lose that time with his family, and the additional cost in travel, not to mention the risk caused by travelling through countries where disclosure of his No Fly List status absent any government facilitation could cause him detained, abused, and even tortured.

**Balance of the Equities and Public Interest.** Finally, Plaintiffs must demonstrate that the balance of equities tips in their favor and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council Inc.*, 555 U.S. 7, 20 (2008). The balance of equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, upholding Mr. Khalid's fundamental liberty interest in interstate and international travel is undeniably in the public interest. "As for the right to travel interstate,

the Supreme Court has held that the '[f]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution,'" *Dunn,* 405 U.S. at 338 (internal quotation omitted). *Abdi v. Wray*, 942 F.3d 1019, 1029 (10th Cir. 2019). "[U]pholding the Constitution undeniably promotes the public interest." *Giovani Carandola*, 303 F.3d at 521; *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)); *Int'l Refugee Assistance Project v. Trump,* 857 F.3d 554, 604 (4th Cir. 2017). Furthermore, the Court has stated that the right to travel abroad is an "aspect of the 'liberty' protected by the Due Process Clause." *Califano v. Torres,* 435 U.S. 1, 4 n.6 (1978). And the Supreme Court has also recognized that "[t]ravel abroad, like travel within the country, may be necessary for a livelihood ... [and] may be as close to the heart of the individual as the choice of what he eats, or wears, or reads." *Kent v. Dulles,* 357 U.S. 116, 126 (1958); *see also Abdi*, 942 F.3d at 1029.

The Government suggests that it has a strong public interest in preventing Khalid from getting on a flight to return to the United States. But it just facilitated that exact relief earlier this year. It has no more of a public interest in preventing him from doing it now as it did then. The only thing that has changed is that Khalid had the temerity to ask for the same relief twice. Substantive due process requires the Government to pursue its objectives narrowly, and here, where the Government has previously provided the relief now sought, a less restrictive alternative—selecting any flight that arrives in the United States before October 10th and taking pre-flight and in-flight security measures to mitigate whatever risk they Government perceives—obviously exists.

## RELIEF REQUESTED

The Court should grant a temporary restraining order, or in the alternative a preliminary injunction, enjoining Defendants to select a flight or flights that allow Mr. Khalid to arrive in the United States before October 10th. Because of the exigent nature of Mr. Khalid's travel and request, Mr. Khalid asks this Court grant or deny the relief requested no later than September 30.

Respectfully Submitted,                      CAIR LEGAL DEFENSE FUND

                                             BY:    **/s/ Lena F. Masri**
                                             LENA F. MASRI (DC 100019)
                                             GADEIR I. ABBAS (VA 81161) β
                                             JUSTIN SADOWSKY (DC 977642)
                                             ZANAH GHALAWANJI (MI P 83116) ç
                                             453 New Jersey Ave, SE
                                             Washington, DC 20003
                                             Phone: (202) 742-6420
                                             Fax: (202) 379-3317
                                             Email: LDF@CAIR.COM

                                             *Attorneys for Plaintiff*
                                             *β Licensed in VA, not in DC. Practice*
                                             *limited to federal matters.*
                                             *ç Licensed in MI, not in DC. Practice*
                                             *limited to federal matters.*

Dated:    September 13, 2022